**FIRST NATIONAL BANK IN LENOX, Appellant,**

v.

**LAMONI LIVESTOCK SALES CO. and First National Bank in Creston, Appellees.**

No. 86–1370.

Supreme Court of Iowa.

Dec. 23, 1987.

Edgar F. Hansell, W. Don Brittin, Jr., and James C. Wine of Nyemaster, Goode, McLaughlin, Emery & O'Brien, P.C., Des Moines, and David L. Christensen of Wilson, Bonnett & Christensen, P.C., Lenox, for appellant.

Robert C. Rouwenhorst of Davis, Grace, Harvey, Horvath, Gonnerman & Rouwenhorst, Des Moines, for appellee Lamoni Livestock Sales Co.

Jon P. Sullivan of Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, for appellee First Nat. Bank in Creston.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, LAVORATO and NEUMAN, JJ.

McGIVERIN, Chief Justice.

Plaintiff bank appeals from the trial court's ruling granting summary judgment to both defendants on identical legal grounds. The court held that plaintiff's security interest in its debtor's livestock

was extinguished pursuant to Iowa Code section 554.9307(1)(1983) [1] upon consignment sale of the livestock by the debtor through a marketing agent of the debtor to a livestock purchaser. Reviewing only the summary judgment ruling and the grounds stated in that ruling, we reverse and remand the case for further proceedings.

I. *Background facts and proceedings.* The record in this summary judgment proceeding reveals the following. Plaintiff First National Bank in Lenox (Lenox) began financing the farming operations of Jerry Parker as early as 1967. The loans made to Parker from time to time as requested were secured by the goods Parker planned to buy with the borrowed money, frequently including livestock. In 1976, Parker signed a blanket security agreement with Lenox which covered his present and future livestock among other farm assets as collateral for any loans Lenox made or would make to Parker. Lenox perfected the security interest. *See* Iowa Code § 554.9401(1)(c).

In January 1982, Parker's outstanding loans with Lenox were consolidated into one master promissory note totaling $155,000 with payment due January 19, 1983. At some point undeterminable from the record, but near the beginning of 1982, Parker also began borrowing from defendant First National Bank in Creston (Creston) to finance cattle purchases. When the master note to Lenox became due the next year, Parker executed a new note with Lenox in the principal amount of $160,000. The new note referred to a jointly executed security agreement dated January 24, 1983, which gave Lenox a security interest in Parker's assets including:

> [A]ll farm products including but not limited to all crops, livestock and supplies used or procured in farming operations whether now or hereafter existing or acquired.... In claiming proceeds, the secured party does not consent to the sale or other disposal of the collateral.

Parker acknowledged that at some point between 1982 and 1983, Lenox bank began requiring him to have checks for the sale of

livestock in which Lenox had a security interest made out jointly to Lenox and to him. Additionally, the bank began sending out lists of its borrowers to sale barns and elevators in the area requesting that checks to its borrowers be made payable jointly to the borrower and the Lenox bank. On November 2, 1983, Lenox sent written notice to defendant Lamoni Livestock Sales Co. (Lamoni) advising it of Lenox's security interest in farm products of numerous local borrowers including Parker, and requesting that a check to any of these borrowers be made payable jointly to include the bank as a payee.

Parker defaulted on the $160,000 note when it came due in January 1984. Without informing Lenox, Parker sold a substantial portion of his cattle through Lamoni on April 26, 1984. He received a check made out to him alone by Lamoni in the amount of $39,646.38 which he delivered to the Creston bank to apply to his debts there. None of that money was paid to Lenox.

Thereafter, Lenox bank filed a petition asserting that the defendants converted Parker's cattle in violation of Lenox's prior security interest in the cattle.

After answering the petition, Lamoni filed a motion for summary judgment on the ground that Lenox's security interest in Parker's livestock was extinguished pursuant to Iowa Code section 554.9307(1) upon Parker's delivery of the livestock to Lamoni. The record consisted of the pleadings, the deposition of Parker and certain exhibits.

During arguments on the motion for summary judgment, Creston joined Lamoni's motion on identical legal grounds. Creston's position was that if Lenox's security interest was extinguished upon delivery of the cattle to Lamoni, the security interest could not follow the proceeds deposited in Creston bank.

■ The trial court sustained the motion and dismissed Lenox bank's claims against Lamoni and Creston. The court stated in

_____

1. Except where otherwise noted, all references in this opinion are to the 1983 Iowa Code.

substance it believed that under Iowa Code section 554.9307(1) a buyer purchasing through a marketing agency in the ordinary course took free of a security interest in farm products regardless of whether he knew of that interest. Concluding that Iowa Code section 554.9307(1)(1983) does not authorize extinguishing Lenox bank's security interest under this record, we reverse the trial court's ruling and remand for further appropriate proceedings.

II. *Application of Iowa Code section 554.9307(1).* Summary judgment is appropriate when the moving party shows there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Iowa R.Civ.P. 237(c). In reviewing this grant of a summary judgment motion, we are guided by the same principles relied upon by the trial court. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. *Adam v. Mount Pleasant Bank & Trust Co.,* 355 N.W.2d 868, 872 (Iowa 1984). The parties agree that the relevant facts on which the court based its ruling are undisputed.

The issue raised in this case requires us to construe and apply portions of Article 9 of the Uniform Commercial Code (UCC), codified in Iowa Code chapter 554, and decide whether the trial court properly applied those statutes. We must determine whether a farmer-debtor extinguishes a creditor's security interest in that farmer's livestock by selling his livestock through a marketing agency. At the center of this controversy is Iowa Code section 554.-9307(1) which reads:

> A buyer in the ordinary course of business ... other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

Lenox argues that because of the "farm products" exception embodied in section 554.9307(1), its security interest in Parker's

livestock remained intact after Lamoni, as Parker's agent, sold the cattle to the eventual buyer.

Generally, a security interest in collateral follows those goods upon sale or disposition of the collateral. The secured party may then redeem or retrieve those goods from the hands of the buyer if the debtor fails to repay the loan for which the goods served as collateral. *See* Iowa Code § 554.9306(2). The creditor may also have a perfected security interest in the proceeds of the collateral sold if its original financing statement covered proceeds or if the creditor perfects a security interest in the proceeds within ten days of the sale. *See* Iowa Code § 554.9306(3).

Iowa Code section 554.9307(1) is an exception to the general rule for situations in which goods are sold in the "ordinary course of business" as that phrase is defined in section 554.1201(9). The "farm products" exception relied upon by Lenox is, in essence, an exception to the exception which refers back to the general rule of section 554.9306(2). A security interest in "farm products," as that term is defined in section 554.9109(3), continues after the farm products are sold if they are purchased from one engaged in farming operations even if the sale is in the ordinary course of business.

It is undisputed by the parties that Parker is engaged in farming operations. Further, the definition of "farm products" in the classification provision of Article 9 includes "livestock." *See* Iowa Code § 554.9109(3). Lenox contends that because the sale of Parker's livestock fits within the farming exception, its security interest in the livestock was not extinguished and summary judgment was improperly granted against Lenox.

Defendants disagree. While they concede that Parker's livestock are "farm products" in Parker's hands, they argue that the livestock became "inventory" as that term is defined in section 554.9109(4) when the cattle were transferred to Lamoni for sale.[2] Their argument is grounded in

---

2. Iowa Code section 554.9109(4) states: "Goods   are ... 'inventory' if they are held by a person

this portion of official comment 4 to section 9–109 in the 1972 official text of the UCC (contained in Iowa Code Annotated section 554.9109):

> Goods are "farm products" only if they are in the possession of a debtor engaged in farming operations.
>
> \*    \*    \*    \*    \*    \*
>
> When crops or livestock ... come into the possession of a person not engaged in farming operations they cease to be "farm products." If they come into the possession of a marketing agency for sale or distribution ..., they become inventory.

Defendants argue that once the livestock "came into the possession" of Lamoni, the livestock became inventory. Being inventory, the livestock no longer fit within the farm products exception and Lenox's security interest did not continue in the livestock or their sale proceeds after Parker's livestock was sold. Defendants cite as support for their position the decision of the Eighth Circuit Court of Appeals in *United States v. Progressive Farmers Marketing Agency*, 788 F.2d 1327 (8th Cir.1986).

Saying it was applying Iowa law, the court in *Progressive* held in a similar factual situation that livestock sold through a marketing agent loses its status as a "farm product." In addition to citing comment 4 to UCC section 9–109(4) as support for its conclusion, the Eighth Circuit relied upon the 1985 legislative amendment to Iowa Code section 554.9307(1). *Id.* at 1330. The amendment to section 554.9307(1), contained in 1985 Iowa Acts chapter 188, specifically includes marketing agents as "buyers in the ordinary course of business" for the purposes of that section of the code.

We have given careful consideration to the reasoning used by the *Progressive* court to interpret Iowa law, but we find ourselves in disagreement with its conclusion.[3] While the legislative intent behind the 1985 amendment to section 554.9307(1) is clear, the livestock sale in this case took place in 1984 before that amendment was enacted. We do not find this subsequent legislative amendment conclusive evidence of the legislature's intent in the original enactment of section 554.9307(1). *See Slockett v. Iowa Val. Community School Dist.*, 359 N.W.2d 446, 448 (Iowa 1984) (the general rule is that a statutory amendment alters rather than clarifies the law). Rather, we look to the UCC as it was embodied in Iowa Code chapter 554 in 1983, the law applicable to the transaction in question.

Defendants' reliance on comment 4 to section 554.9109 is misplaced. As Lenox points out, section 554.9109 falls within part one of Article 9, the definition and classification section. Because the filing requirements for financing statements in the UCC vary with the type of "goods" used as collateral, *see* Iowa Code section 554.9101, initial classification of goods is very important to a secured creditor. Once goods are classified in the hands of the debtor, they do not lose that classification relative to the initial creditor upon sale or transfer of the goods. *See* Iowa Code § 554.9306(2), (3). Livestock owned by a marketing agency is inventory relative to the security filing requirements of that agency's creditors. Relative to the creditors of farmers engaged in farming operations who sell their livestock *to* the marketing agency, the livestock are farm products.

■ Section 554.9307(1) falls under part 3 of Article 9 which deals with the rights of third parties and relative priorities among them. In the physical custody of Lamoni, Parker's livestock were still farm products

who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment."

**3.** The Supreme Court of South Dakota has also disagreed with *Progressive,* but on different grounds. In *Sanborn County Bank, Inc. v. Mag-*

*ness Livestock Exchange,* 410 N.W.2d 565 (S.D. 1987), the court held that an auction agency was liable for conversion under the law applicable to commission merchants. *See* 32 Am.Jur.2d *Factors and Commission Merchants* § 57B. The court concluded that "liability for conversion by an auction agency exists regardless of whether collateral is a 'farm product' or 'inventory.'" 410 N.W.2d at 567.

relative to Lenox's original security interest. Because of the farm products exception of section 554.9307(1), the sale of those animals by Lamoni on Parker's behalf did not extinguish Lenox's security interest.

We note further that the position urged upon us by defendants leads to anomalous results. Clearly, if Parker had sold his cattle directly to the eventual buyer, Lenox's security interest would continue in the livestock pursuant to Iowa Code section 554.9307(1). Additionally, if Parker had sold his livestock to Lamoni and then Lamoni in turn had sold the cattle to the eventual buyer, the Lenox security interest would also survive because section 554.-9307(1) allows a buyer to take free of only those security interests created by the party selling to him. *See* Iowa Code § 554.9306(2) (security interest continues in collateral notwithstanding sale). Parker, not Lamoni, created the security interest held by Lenox in his livestock.

If defendants' position is correct, however, then Parker's sale of livestock *through* Lamoni but not *to* Lamoni would extinguish Lenox's security interest. Under that theory, the continued existence of Lenox's security interest would depend upon the method of sale selected by Parker, the debtor. Lamoni is, in essence, a conduit to facilitate livestock sales between farmers and livestock buyers. We do not believe the legislature intended to give a farmer-debtor the power to extinguish a security interest of his creditor in farm products merely by selecting a sales agent to facilitate the sale. We conclude that before the 1985 amendment to section 554.-9307(1), the legislature intended the effect of livestock sales on a security interest to be the same whether made without a sales agent, through a sales agent, or to a sales agent.

Even if we thought, as the court in the *Progressive* case did, that comment 4 to section 554.9109 was meant to apply to a priority dispute such as the one involved in the underlying case here, we believe that under our factual context "possession" as used in comment 4 refers to actual ownership and not the mere physical control or custody that Lamoni had over Parker's livestock.

Possession is not defined anywhere in the UCC. Faced with a similar dilemma, one bankruptcy court has decided that possession means actual ownership. In *In re Roberts*, 38 B.R. 128 (D.Kan.1984), the court was asked to decide whether crops owned by a debtor-farmer but stored in a grain elevator not on the debtor's farm were "farm products" under UCC section 9–307 because they were in the farmer's "possession." After noting its fruitless search for cases holding that stored grain is *not* in a farmer's "possession," the court cited this rule from a treatise by professor Gilmore: "Goods cease to be 'farm products' ... when they move from the possession and ownership of a farmer to that of a non-farmer." *Id.* at 133 (quoting G. Gilmore, *Security Interests in Personal Property* section 12.3 at 174). The court went on to conclude that because "Clearly, Professor Gilmore did not contemplate that grain lost its farm product classification when stored by a farmer that still owned the grain," the farmer possessed the grain for purposes of UCC section 9–307. *Id.; see also* Meyer, *The 9–307(1) Farm Products Puzzle: Its Parts and Its Future,* 60 N.D.L.Rev. 401 (1984) (author argues that stored grain is still a farm product and is analogous to cattle awaiting sale in a feed lot). *But see Garden City Prod. Credit Ass'n v. International Cattle Sys.,* 32 U.C. C.Rep.Serv. (Callaghan) 1207 (D.Kansas 1981) (livestock in temporary custody of sales or marketing agent are in agent's "possession" for purposes of UCC 9–307(1) and become "inventory").

A similar analogy can be drawn from property law concepts. The Minnesota Supreme Court in a lengthy discussion on the ambiguity of the word possession stated this:

> Ambiguity in the meaning of the word *possession* dates from the introduction into the law of the concept of *constructive possession.*
>
> *       *       *       *       *       *
>
> ... *constructive possession* of personal property by its owner exists where the

**448**

owner has *intentionally* given the *actual* possession—namely, the direct physical control—of the property to another for the purpose of having him do some act *for the owner* to or with the property. ...

\* \* \* \* \* \*

Where the owner retains constructive possession, the party to whom bare physical control of the property had been entrusted for the owner's purpose does not have possession but only custody. *Jacobson v. Aetna Casualty & Sur. Co.,* 233 Minn. 383, 386–88, 46 N.W.2d 869, 871 (1951) (emphasis in original); *accord Goodrich Silvertown Stores v. Collins,* 167 Or. 40, 115 P.2d 332, 335 (1941) (temporary care or custody of property does not rise to the dignity of "possession" which implies custody coupled with a right or interest of proprietorship). *But cf. Koecher v. Koecher,* 374 N.W.2d 542 (Minn.App.1985) (general meaning of "possession" is actual possession).

 The meaning of possession is an open question in this context. Given the authority cited above on the definition of "possession," coupled with what we have said about the anomalous results of treating consigned farm products as a marketing agency's goods, we conclude that "possession" in the context of comment 4 to UCC section 9–109 as applied to the facts of this case means ownership. Lamoni did not own Parker's livestock, and, therefore, consignment sale of Parker's livestock through Lamoni did not extinguish Lenox's security interest.

III. *Consent to the sale of the livestock.* Finally, defendant Lamoni argues in the alternative that summary judgment for defendants was proper because Lenox consented to the sale of Parker's livestock.

We note first that the consent issue was not raised in the defendants' motion for summary judgment and, consequently, was not addressed or relied on by the district court. The defendants could have filed an Iowa Rule of Civil Procedure 179(b) motion asking the trial court to expand its ruling to cover the consent issue, but this was not done.

In any event, it is a factual question whether Lenox impliedly consented to the sale by Parker of his livestock. *See* Iowa R.Civ.P. 237(c). The record indicates that Lenox was not aware of the sale before it occurred. The language in the security agreement between Lenox and Parker discussed above expressly stated that Lenox did not intend to give permission for cattle sales by requiring sales checks to be made out jointly to Parker and Lenox. The court's ruling granting summary judgment to defendants cannot be upheld under this record on the alternate basis urged by defendants.

IV. *Disposition.* For the reasons stated above, the trial court's ruling sustaining defendants' motion for summary judgment is reversed. The case is remanded for further appropriate proceedings.

REVERSED AND REMANDED.