**In re H.S.A. II, INC., Debtor.**

**GMAC Business Credit, L.L.C., Plaintiff,**

**v.**

**Ford Motor Co. and H.S.A. II, Inc., Defendant.**

**Bankruptcy No. 00–41441–R. Adversary No. 00–4852.**

United States Bankruptcy Court, E.D. Michigan, Southern Division.

Jan. 14, 2002.

A. Stuart Thompkins, for plaintiff.

Larry K. Griffis, Detroit, MI, for Ford Motor Company.

Max Newman, Bloomfield Hills, MI, for H.S.A. II.

*Opinion Regarding Cross Motions for Summary Judgment*

STEVEN W. RHODES, Bankruptcy Judge.

This matter is before the Court on cross motions for summary judgment filed by the plaintiff, GMAC–BC, and the defendant, Ford Motor Co. Following a hearing on October 15, 2001, the Court took the matter under advisement. For the reasons set forth below, the Court concludes that there are no genuine issues of material fact and that GMAC–BC is entitled to summary judgment as a matter of law.

I.

On February 2, 2000, H.S.A. II filed its chapter 11 petition. On February 3, 2000, the Court entered an interim order for post-petition financing pursuant to which GMAC–BC would provide financing to H.S.A. II for the production of parts in exchange for a first priority perfected security interest in all property of the estate acquired by H.S.A. II post-petition, including inventory, raw materials and finished goods. (See GMAC–BC's Corrected Motion for Summary Judgment, Ex. A.) On April 3, 2000, the final financing order was entered. (See GMAC–BC's Ex. B.)

On April 21, 2000, a separate financing order was entered between Ford Motor Co. and H.S.A. II. This order, in part,

approved, nunc pro tunc, unsecured credit from Ford Motor Co. pursuant to § 364(b). Apparently, H.S.A. II and Ford Motor Co. had been operating under an agreement, which had not been approved by the Court, whereby Ford would purchase and supply steel to be used by H.S.A. II for the production of Ford Motor Co. parts. Ford also was making advance payments to H.S.A. II to cover expenses. The April 21, 2000 order approved the Supply Protection Agreement between Ford and H.S.A. II, which provided in part that Ford would purchase and supply all steel ("Supplied Material") to be used by H.S.A. II in the production of parts for Ford. (GMAC–BC's Ex. C, Supply Protection Agreement at 3.) The agreement further provided that Ford would recoup the cost of the Supplied Material from its accounts payable to H.S.A. II. Upon completion of parts, H.S.A. II would invoice Ford and Ford would pay H.S.A. II the amount of the invoice, less the cost of Supplied Materials. The agreement also provided for advance payments whereby Ford would make weekly payments to H.S.A. II to cover overhead and costs attributable to the production of Ford parts. (Supply Protection Agreement at 6.) The order stated that Ford would have an administrative expense claim for the advance payments. (Order at 2.) The agreement also provided that Ford reserved the right to recoup or set off the advance payments against Ford's accounts payable. (Agreement at 6.)

H.S.A. II ceased operations on June 20, 2000. At that time, H.S.A. II had in its possession approximately $150,000 in work in process for Ford, $1,034,351.65 in finished goods for Ford and $273,960.26 in Ford's steel inventory. Ford sent six trucks to H.S.A. II's premises on June 20, 2000 to pick up the property. H.S.A. II's employees refused to release it. By the time H.S.A. II's owner was contacted and authorized the employees to cooperate with Ford, only one truck was able to remove property. Ford sent trucks back the next day to pick up the remaining property, however, at that time, representatives of GMAC–BC were there and halted the removal. GMAC–BC's counsel faxed a letter to Ford on June 22, 2000, informing Ford that it had instructed H.S.A. II not to release any Ford related property unless Ford agreed that it would pay for the inventory without any set-offs against amounts H.S.A. II owed Ford. This was based on GMAC–BC's assertion that it had a first priority security interest in all of H.S.A. II's inventory, raw material and finished goods.

GMAC–BC filed this adversary proceeding to determine the validity, priority and extent of its lien on the property. Ford filed a counterclaim against GMAC–BC and a cross claim against H.S.A. II asserting that the refusal of GMAC–BC and H.S.A. II to allow Ford to take possession of the property in question constituted conversion for which GMAC–BC and H.S.A. II are liable to Ford for treble damages.

## II.

Ford asserts four arguments in support of its position that it has a priority interest in the property. First, Ford argues that pursuant to M.C.L. § 440.9307(1), Ford takes free of GMAC–BC's security interest because Ford is a buyer in ordinary course of business. Second, Ford contends that H.S.A. II's sale of property to Ford was authorized by GMAC–BC. Therefore, GMAC–BC's security interest was extinguished. Third, Ford relies on UCC § 2–722 and § 2–501 to argue that it has possessory rights in the Ford property superior to GMAC–BC's security interest. Fourth, Ford asserts that because it supplied the specialty steel to H.S.A. II under

a bailment agreement and the steel was segregated and identified as Ford property, it has a possessory interest in the supplied steel superior to GMAC–BC's interest.

Ford provided the affidavit of Stout Risius Ross, Inc. in support of its motion and response. (See Ford's Ex. 1.) SRR acted as Ford's agent and representative with respect to the purchase and sale arrangement between H.S.A. II and Ford. The affidavit states that SRR was responsible for making advance payments from Ford to H.S.A. II, monitoring Supplied Material provided by Ford to H.S.A. II, monitoring payments made by Ford to H.S.A. II for manufactured parts and monitoring all work-in-process, finished goods and raw material used by H.S.A. II for Ford parts. The affidavit states that all Supplied Material of Ford was segregated and identified as the property of Ford. Ford also provided a letter from Ford to H.S.A. II, dated June 12, 2000, outlining Ford's agreement with H.S.A. II to supply raw material for the production of Ford parts. (See Ford's Ex. 4.)

Ford also contends that GMAC–BC violated the terms of ¶ 19 of GMAC–BC's financing order, which provides that GMAC–BC could take possession of its collateral only upon 5 days written notice to the debtor, its counsel, the committee, customers and pre-petition lenders, after an event of default. Ford contends that GMAC–BC failed to give notice of an event of default or of its intent to exercise its rights as a secured lender.

GMAC–BC refutes all arguments advanced by Ford and contends that its fully perfected security interest has priority over any interest asserted by Ford. GMAC–BC contends that H.S.A. II's attorney stated in court that the agreement between H.S.A. II and Ford was outside the ordinary course of business. Further,

GMAC–BC contends that Ford cannot be a buyer in the ordinary course because Ford setoff the purchase price of the parts against the debt the debtor owed Ford and did not provide any new value.

GMAC–BC further contends that Ford's argument that GMAC–BC authorized the sale of property to Ford and therefore GMAC–BC's security interest was extinguished is flawed. GMAC–BC contends that any transaction entered into between Ford and the debtor was always subject to GMAC–BC's prior perfected security interest.

GMAC–BC also disputes Ford's contention that the debtor was merely a bailee with respect to the supplied steel. GMAC–BC argues that even if a bailment existed, its security interest still attached to the supplied steel.

### III.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56. The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party to set forth specific facts showing a triable issue." *Janda v. Riley–Meggs Indus., Inc.*, 764 F.Supp. 1223, 1227 (E.D.Mich.1991). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is appropriately granted where the issues in a case involve no more than the application of legal principles to undisputed facts. *See Choate v. Landis Tool Co.,* 486 F.Supp. 774 (E.D.Mich.1980).

### IV.

M.C.L. § 440.9306(2)[1] provides in part: (a) Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

M.C.L. § 440.9306(2).

M.C.L. § 440.9307(1)[2] provides an exception to the general rule of M.C.L. § 440.9306(2) and states in part:

[A] buyer in ordinary course of business, as defined in section 1201(9), takes free of a security interest created by his or her seller even though the security interest is perfected and even though the buyer knows of its existence.

M.C.L. § 440.9307(1).

In *Nashville Eagle, Inc. v. Ford Motor Credit Co. (In re Superior Ground Support),* 140 B.R. 878 (Bankr.W.D.Mich. 1992), the court explained the purpose of 9–307:

[Section 9–307] exists to protect good faith purchasers from the seller's inventory. Rather than requiring a buyer to research the status of the seller's inventory each time there is a purchase, the burden is placed on the lender secured by the inventory to keep regular account and make sure that the overall value of its collateral is not declining. The secured creditor is not often harmed by this provision. Under Mich. Comp. Laws Ann. § 440.9306 (Supp.1992), the creditor's lien interest continues in the proceeds of any sale. Overall, by facilitating the debtor's sales, these sections of the U.C.C. work to the benefit of both parties. The debtor can freely sell its inventory for a profit while the lender's security interest continues in new inventory purchased with the profit and in the proceeds generated by sales.

*Id.* at 880–81.

M.C.L. § 440.1201(9) defines the term "buyer in ordinary course of business" as:

a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the good, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices.... A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a preexisting contract for sale.... A person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt is not a buyer in ordinary course of business.

M.C.L. § 440.1201(9).

■ GMAC–BC contends that Ford cannot qualify as a purchaser in ordinary

---

**1.** M.C.L. § 440.9306 was amended effective July 1, 2001. However, the amendment is not applicable to this proceeding, which was filed prior to that date.

**2.** M.C.L. § 440.9307 was also amended effective July 1, 2001.

course of business because any transfer of the Ford property to Ford would be on account of a pre-existing debt. The requirement that a buyer in ordinary course not acquire goods in satisfaction of a pre-existing debt was explained in *United States v. Handy and Harman*, 750 F.2d 777 (9th Cir.1984):

> By barring a purchaser who takes goods in satisfaction of a debt from ordinary course status, the code requires that a buyer in ordinary course of business give new value for the goods.
>
> The new value requirement is central to the functioning of the code's system of inventory financing. Inventory is valuable to a merchant only if he can sell it to his customers. If the merchant's inventory financier could foreclose the security interest in the goods after they had been sold, prospective customers would be reluctant to buy the merchandise. Recognizing this, § 9307(1) facilitates sales of inventory by providing that the ordinary buyer of inventory takes the goods free of any security interest, even if he knows that they are subject to a security interest, so long as he does not have actual knowledge that the sale violates the terms of a security agreement.
>
> At the same time, the rule of § 9307(1) is carefully limited to avoid unduly endangering the position of the inventory financier. By incorporating the definition of buyer in ordinary course of business, § 9307(1) permits a buyer of inventory to take the inventory free of a security interest only if he gives some new value in exchange for the inventory. The inventory financier is protected because his security interest in the inventory will attach to the new value, which constitutes "proceeds" of the inventory. If the rule were otherwise, and a transferee of inventory who received the goods in satisfaction of a pre-existing debt were permitted to keep them free of security interests, the effect would be to enable an unsecured creditor-the transferee-to bootstrap himself into priority over the secured creditor who looks to the inventory for security. The new value requirement should be strictly construed to preclude the frustration of the code's priority provisions.

*Id.* at 781–82.

In *Handy & Harman*, the plaintiff, claiming a security interest in the inventory of Coronado Trading, brought an action against the purchaser of the inventory, Handy & Harman, for return of the inventory or its value. Handy & Harman argued that it was a buyer in ordinary course of business and, therefore, took the inventory free of the security interest of the plaintiff. Coronado had sent the inventory to Handy & Harman and requested payment. However, at that time Coronado owed Handy & Harman $30,000 for previous purchases. Rather than issue a check to Coronado for the purchase of the inventory, Handy & Harman credited the value of the inventory against Coronado's debt to Handy & Harman. The court concluded that Handy & Harman did not qualify as a buyer in ordinary course of business because it did not give new value. The court stated:

> This case illustrates the problem created when Handy & Harman decided to treat its promise to pay Coronado for the refining lots as subject to a set off against the debt Coronado already owed to Handy & Harman. While the set off was legal, it was inconsistent with the new value requirement. We conclude that Handy & Harman may not claim the status of a buyer in ordinary course of business. Handy & Harman's exercise of the offset created the very prob-

lem that the new value requirement was designed to prevent. Because of the offset, Coronado received no money to which the government's security interest could attach. The government is left in exactly the same position that it would occupy if Handy & Harman had never promised to pay Coronado and had taken the collateral in partial satisfaction of Coronado's debt in the first place.

*Id.* at 782.

■ Ford contends that the facts here are distinguishable from the facts in *Handy & Harman* because Ford paid in advance for the property while in *Handy & Harman* the pre-existing debt Coronado owed to Handy & Harman was unrelated to the amount Handy & Harman owed for the purchase of the inventory. Ford's argument ignores the purpose of M.C.L. § 440.9307. As noted above, the reason that a security interest does not continue in collateral that is sold to a buyer in ordinary course is that the security interest continues in the proceeds, thus protecting the secured creditor. Here, there are no proceeds to which GMAC–BC's security interest can attach because no new value was given. The Court therefore concludes that a transfer of property to Ford with an offset by Ford of the purchase price against the amount Ford advanced to H.S.A. II is a transfer in satisfaction of a money debt.

■ Ford fails to qualify as a buyer in ordinary course of business for an additional reason. As noted, "[a] person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices." Although it is not disputed that H.S.A. II was in the business of manufacturing and selling parts, such as those at issue here, the arrangement set forth in the supply protection agreement for the manufacture and sale of parts to Ford was not the "usual or customary practice" of H.S.A. II. Indeed, the order approving the agreement was titled, in part, order "approving contracts outside the ordinary course of business under 11 U.S.C. § 363(b)(1)."

Accordingly, the Court concludes that Ford is not a buyer in ordinary course of business.

## V.

■ Ford also argues that the sale did not violate GMAC–BC's security interest because GMAC–BC authorized the sale of its collateral. As noted above, a security interest continues in collateral notwithstanding sale unless the disposition was authorized. *See* M.C.L. § 440.9306(2).

Ford relies on two provisions in GMAC–BC's financing order, which, Ford contends, evidence GMAC–BC's authorization of the sale of its collateral. The first, ¶ 6(a)(xii), gives GMAC–BC a security interest in proceeds. Therefore, Ford argues, GMAC–BC contemplated the sale of inventory. The second, ¶ 18.O, provides:

18. The following shall constitute events of default under this Order:

O. Debtor uses any proceeds of the Loans to fund production for any non-participating Major Customer unless such customer has made a payment(s) to Debtor in advance of production equal to the estimated costs of such customers' future production in excess of the piece price to be paid by the customer (including all incremental overhead expenses associated with producing for the customer post-petition).

(See Final Order Authorizing Postpetition Financing, ¶ 18.O at 14.)

542

The Court concludes, more due to GMAC–BC's conduct than due to specific provisions in its financing order, that GMAC–BC did acquiesce to the sale of inventory to Ford, free of its security interest. GMAC–BC does not argue that it was unaware of the arrangement between Ford and H.S.A. II. Further, GMAC–BC does not assert any security interest in parts manufactured by H.S.A. II and obtained by Ford between the time GMAC–BC entered into its financing arrangement with H.S.A. II and the time H.S.A. II ceased doing business.

However, even if GMAC–BC authorized the sale of inventory free of its security interest, there had not yet been a sale of the property at issue here. M.C.L. § 440.2106(1) provides in part, "A 'sale' consists of the passing of title from the seller to the buyer for a price (section 2401)." M.C.L. § 440.2401 provides in part, "title to goods passes from the seller to the buyer in any manner and on any conditions agreed on by the parties."

Ford contends that because virtually all of its purchase orders contain the terms "FOB Carrier Supplier's PLT," title and risk of loss was transferred to Ford upon completion of the parts. F.O.B. is a UCC delivery term. *See* M.C.L. § 440.2319. When the term is F.O.B. point of shipment, the seller bears the expense and risk of putting the goods in the possession of the carrier. *Id.* "Once the goods are in the possession of the carrier, title passes to the purchaser." *Starbrite Distr., Inc. v. Excelda Mfg. Co.*, 454 Mich. 302, 306, 562 N.W.2d 640 (1997).

The Court concludes as a matter of law that the term "FOB Carrier Supplier's PLT" cannot mean that the risk of loss was transferred upon mere completion of the parts. Rather it means that upon placement of the parts with a carrier at the supplier's plant, title and risk of loss

are transferred to the buyer. Because the finished parts had not yet been placed with a carrier at H.S.A. II's plant, no sale had yet occurred. Accordingly, the Court concludes that with respect to the property at issue, GMAC–BC's security interest was not extinguished by an authorized sale.

VI.

■ Ford also asserts that GMAC–BC's security interest did not extend to the Supplied Steel because H.S.A. II was merely a bailee. A security interest attaches to collateral when (1) the debtor has signed a security agreement describing the collateral, (2) value has been given, and (3) the debtor has "rights in the collateral." M.C.L. § 440.9204(1). It is Ford's position that, as a bailee, the debtor did not have sufficient rights in the collateral for the security interest to attach. This argument was rejected by the court in *Litwiller Mach. & Mfg., Inc. v. NBD Alpena Bank*, 184 Mich.App. 369, 457 N.W.2d 163 (1990). There, the court stated:

The phrase "rights in the collateral" is not defined in the UCC. The UCC, however, does not require that a debtor have full ownership rights. Indeed, title to goods is of little relative consequence under the UCC. A deliberate effort was made by the drafters of the UCC to avoid defining the rights of the parties to goods in terms of who has title.

*Id.* at 165 (citations omitted).

The *Litwiller* court went on to quote with approval the case of *Morton Booth Co. v. Tiara Furniture Inc.*, 564 P.2d 210 (Okla.1977), wherein the court describe "rights in the collateral" as follows:

[M]ere possession of goods is not enough under the Code to demonstrate that the debtor had "rights" in the collateral.... The provisions of Article 9 were never intended to give rise to a security interest where the debtor was,

for example, a mere gratuitous bailee. The cases generally hold, however, that where a debtor gains possession of collateral pursuant to an agreement endowing him with any interest other than naked possession, the debtor has acquired such rights as would allow the security interest to attach. [564 P.2d at 214.]

*Litwiller* at 165.

The facts in *Litwiller* and *Booth* are similar to those before the Court. In *Booth,* Booth and Tiara had an agreement whereby Booth supplied component parts to Tiara for the manufacture of cabinets. Tiara then sold the finished product back to Booth. When Tiara defaulted on its bank loans secured by after-acquired inventory, the bank asserted a security interest in the component parts supplied by Booth. The court concluded that Tiara had rights in the component parts beyond mere naked possession. It had the right to incorporate the component parts into a finished product and sell it to Booth. This, the court concluded, was sufficient to allow the bank's security interest to attach to the component parts.

Similarly, in *Litwiller,* Litwiller entered into an agreement with Koss, a steel fabrication company, whereby Litwiller purchased steel components needed by Koss for the production of parts to be sold back to Litwiller. Koss defaulted on its loan and the creditor asserted a security interest in the component parts. The court concluded that Koss's right to use and incorporate the components and sell the completed parts to Litwiller amounted to more than naked possession of the components. Therefore, Koss had sufficient rights in the collateral for the security interest to attach.

Here, the debtor had the right to use the steel supplied by Ford for the production of Ford parts and then to sell the parts back to Ford. This is more than mere "naked possession" of the supplied steel. The court in *Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank of Tulsa,* 705 F.2d 396 (10th Cir.1983), recognized the potential problem that would arise if a security interest did not extend to property such as the supplied steel:

> Otherwise, if a debtor received collateral from a third party under an agreement giving the debtor authority to exercise any outward indicia or manifestations of ownership or control, a would-be creditor could easily be misled into making a loan under an ineffective security agreement.

*Id.* at 399.

Accordingly, the Court concludes that GMAC–BC's security interest did extend to the supplied steel.

## VII.

Finally, Ford contends that it has rights under M.C.L. § 440.2722(a), which provides:

> Where a third party so deals with goods which have been identified to a contract for sale as to cause actionable injury to a party to that contract
>
> (a) a right of action against the third party is in either party to the contract for sale who has title to or a security interest or a special property or an insurable interest in the goods; and if the goods have been destroyed or converted a right of action is also in the party who either bore the risk of loss under the contract for sale or has since the injury assumed that risk as against the other[.]

M.C.L. § 440.2722(a).

This provision is not applicable here. Generally speaking, a secured party is justified in interfering with a contract to protect a superior security interest. *See*

*Hold–Trade Int'l v. Adams Bank & Trust (In re Quality Processing),* 9 F.3d 1360 (8th Cir.1993). *See also Caven v. American Fed. Sav. & Loan Assoc.,* 837 F.2d 427, 432 (10th Cir.1988); *Ford v. C.E. Wilson & Co.,* 129 F.2d 614, 617 (2d Cir.1942); *Spencer Cos. v. Chase Manhattan Bank,* 81 B.R. 194, 204 (D.Mass.1987) (no improper intent to interfere when secured party acted to protect its secured position). A party is justified in interfering with a third party's contract if it "asserts in good faith a legally protected interest of its own ... if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." Restatement (Second) of Torts § 773. *See also Langeland v. Farmers State Bank,* 319 N.W.2d 26, 33 (Minn.1982) (no liability for actions "in furtherance of a superior legal right").

Because any interference by GMAC–BC was to protect its rights, Ford does not have a cause of action under M.C.L. § 440.2722.

### VIII.

■ Ford's contention that GMAC–BC's failure to give the required notice before exercising its rights is irrelevant here. The notice provision essentially provided that upon default, GMAC–BC could exercise its rights and remedies, without further order of the court, upon five days written notice. Ford fails to explain how a failure of GMAC–BC to comply with the notice provision somehow operates to give Ford priority over GMAC–BC's security interest, and the Court concludes that it does not.

### IX.

In closing, the Court notes that although at first glance the result here may appear to be inequitable to Ford, Ford was in a position to protect its interests but failed to do so. For whatever reason, Ford structured its agreement with H.S.A. II in such a way that left Ford primed by GMAC–BC's priority interest. Ford thereby assumed the risk that was, unfortunately for Ford, eventually realized when H.S.A. II ceased operations.

Accordingly, Ford's motion for summary judgment is denied and GMAC–BC's motion for summary judgment is granted. An appropriate order will be entered.