# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1968

_____

In re: Western Iowa Limestone, Inc.,      *

                Debtor.      *

_____

United Bank of Iowa,      *

                Appellee,      *

         v.      *

Independent Inputs; Leinen, Inc.; Paul Leinen,      *

                Appellants,      *

Western Iowa Limestone, Inc.,      *

                Appellee.      *

Appeal from the United States Bankruptcy Appellate Panel for the Eighth Circuit.

[PUBLISHED]

_____

Submitted: January 17, 2008
Filed: August 13, 2008

_____

Before LOKEN, Chief Judge, HANSEN and MURPHY, Circuit Judges.

_____

HANSEN, Circuit Judge.

This case involves a dispute between a secured lender (who held a security interest in its debtor's inventory) and subsequent purchasers of that inventory (who left their purchased goods on the debtor's premises) over whose interest took priority when the debtor filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. The bankruptcy court[1] determined that the subsequent purchasers were buyers in the ordinary course of business, as defined in Iowa Code § 554.1201(9) (2005),[2] by virtue of their constructive possession of the goods, giving the buyers priority under Iowa Code § 554.9320(1) (2005). The Eighth Circuit Bankruptcy Appellate Panel (BAP) reversed, concluding that the buyers did not have constructive possession of the goods under Iowa law. United Bank of Ia. v. Indep. Inputs (In re W. Ia. Limestone, Inc.), 375 B.R. 518 (8th Cir. B.A.P. 2007). We now reverse the BAP's judgment and reinstate the decision of the bankruptcy court.

I.

Western Iowa Limestone, Inc. (WIL) owned several quarries throughout Iowa, and it began marketing agricultural lime as a by-product of its operations in 2004. It marketed the ag lime through six fertilizer and chemical dealers, who resold the ag lime at retail. In January 2005, one of WIL's dealers, Independent Inputs, LLC, purchased 5,000 tons of ag lime from WIL, and in February 2005, two other dealers, Paul Leinen and Leinen, Inc. (collectively "Leinen" and hereinafter, together with Independent Inputs, referred to as "Dealers"), purchased a total of 13,400 tons of ag lime. The Dealers paid for the ag lime at the time of the purchases, and each of the bills of sale noted that the ag lime would remain at the quarry until the Dealers sold

_____

[1]The Honorable Timothy J. Mahoney, then Chief Judge, United States Bankruptcy Court for the District of Nebraska.

[2]In 2007, the Iowa legislature renumbered § 554.1201, and "Buyer in ordinary course of business" is now defined at Iowa Code § 554.1201(2)(i). We refer to the section as codified at the time of the relevant events.

the ag lime to their ultimate customers. This arrangement was beneficial to WIL, which also provided trucking services. WIL maintained its ag lime in a single fungible pile on its premises. The ag lime that the Dealers purchased likewise remained in the fungible pile until resold to their customers and removed from the premises.

WIL filed a petition under Chapter 11 of the Bankruptcy Code on December 12, 2005. At that time, Independent Inputs had resold and removed 416 tons of ag lime from WIL's premises, and Leinen had removed 1,406 tons. United Bank of Iowa is WIL's largest secured creditor, and it had a security interest in all of WIL's assets, including its inventory, accounts receivable, and proceeds, to secure a $6 million loan. The ag lime remaining on WIL's premises was sold in the bankruptcy proceedings as part of its inventory, and the Dealers filed a joint objection to the proposed distributions from the sale of the inventory, claiming priority over United Bank as buyers in the ordinary course of business (BIOC) to the extent of the value of the ag lime they had purchased but had not yet removed from WIL's premises. Independent Inputs' claim was for $35,522, and Leinen's claims were for $89,508.

The bankruptcy court initially determined that the Dealers failed to establish BIOC status under Iowa law because they did not take physical possession of the ag lime or have a right to recover the goods under Article 2 of the Iowa Uniform Commercial Code (Iowa UCC) as required by Iowa Code § 554.1201(9). On a motion to alter or amend, the bankruptcy court reversed itself, concluding that the Dealers had taken constructive possession of the ag lime and had satisfied the requirements for BIOC status under § 554.1201(9). United Bank appealed, and the BAP reversed, concluding that the Dealers did not constructively possess the ag lime under Iowa law for purposes of a priority contest between a secured creditor and a purchaser. Because the BAP concluded that the Dealers did not have constructive possession of the ag lime, it avoided the separate issue of whether constructive possession satisfies the

requirement of "tak[ing] possession" contained in § 554.1201(9).  The Dealers appeal from the BAP's decision.

## II.

"In an appeal from the BAP, this court sits as a second court of review, reviewing [the bankruptcy court's] findings of fact for clear error and [its] conclusions of law de novo."  Capital One Auto Fin. v. Osborn, 515 F.3d 817, 821 (8th Cir. 2008).  Whether the Dealers constructively possessed the ag lime under Iowa law is a mixed question of fact and law, which is subject to *de novo* review.  DeBold v. Case, 452 F.3d 756, 761 (8th Cir. 2006).  We likewise review *de novo* the interpretation and application of state law.  Nolles v. State Comm. for Reorganization of Sch. Dists., 524 F.3d 892, 901 (8th Cir. 2008) (citing Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991)).

Under Iowa's UCC law, "a buyer in ordinary course of business . . . takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence."  Iowa Code § 554.9320(1).  Thus, the Dealers take free of United Bank's prior security interest if they meet the definition of a BIOC.  "Buyer in ordinary course of business" is defined by the Iowa UCC as

> a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. . . .  Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under Article 2 may be a buyer in ordinary course of business.  'Buyer in ordinary course of business' does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

Iowa Code § 554.1201(9).

-4-

Relevant to this appeal, BIOC status requires that the sale comport with the usual or customary practices for the kind of business involved and that the buyer take possession of the goods. (The Dealers do not claim that they had a right to recover under Article 2.) We begin with the central issue of this case–that is, whether a buyer who purchases fungible goods from a seller but leaves the goods at the seller's premises satisfies the requirement that the buyer "take[] possession of the goods." Id. We must determine whether constructive possession is within the meaning of the statute, and if so, whether the circumstances of this case amount to constructive possession sufficient to confer BIOC status.

The penultimate sentence of the definition of a BIOC requires that the buyer either "take[] possession" or "ha[ve] a right to recover the goods from the seller under Article 2." Id. The requirement was added to the Uniform Commercial Code (UCC) in 1999, and the Iowa legislature adopted the revised UCC provision verbatim in 2000. The term "possession" is not defined in the Iowa UCC, and § 554.1201(9) does not elaborate on what is meant by "tak[ing] possession." Iowa courts "determine legislative intent from the words chosen by the legislature . . . . Absent a statutory definition or an established meaning in the law, words in the statute are given their ordinary and common meaning by considering the context within which they are used." City of Waterloo v. Bainbridge, 749 N.W.2d 245, 248 (Iowa 2008) (internal marks omitted). Iowa courts look beyond the statute's express terms only when the language is ambiguous. "A statute . . . is ambiguous if reasonable minds could differ or be uncertain as to the meaning of the statute." Id. Language that is "plain, clear, and susceptible to only one meaning" is unambiguous. Id.

Section 554.1201(9) refers only to "possession," not to "physical possession" or "constructive possession." In the context of § 554.1201(9), both physical possession and constructive possession are plausible meanings of the bare term "possession," and we conclude that the term is ambiguous as used in § 554.1201(9). See First Nat'l Bank in Lenox v. Lamoni Livestock Sales Co., 417 N.W.2d 443, 447 (Iowa 1987) ("'Ambiguity in the word *possession* dates from the introduction into the

-5-

law of the concept of *constructive possession*.'" (quoting Jacobson v. Aetna Cas. & Sur. Co., 46 N.W.2d 869, 871 (Minn. 1951)).  We therefore apply the rules of statutory interpretation to ascertain the Iowa legislature's intent in requiring a buyer to take possession before being considered a BIOC.

In interpreting a statute, the Supreme Court of Iowa looks to the common law to construe undefined terms.  See Lamoni Livestock Sales, 417 N.W. 2d at 447-48; S & S, Inc. v. Meyer, 478 N.W.2d 857, 860 (Iowa Ct. App. 1991) ("Unless displaced by the UCC, . . . the common law supplement[s] its provisions.").  In Lamoni Livestock Sales, the court interpreted the term "possession" in the context of comment 4 to Iowa UCC § 554.9109, which distinguished between the characterization of goods as farm products or inventory depending on whether the goods were "in the possession of a debtor engaged in farming operations" or had "come[] into the possession of a marketing agency."  Iowa Code § 554.9109, cmt. 4 (1987).[3]  The court relied on the concept of constructive possession to hold that livestock in the physical possession of a sale barn (or marketing agency) was nonetheless constructively possessed by the farmer who placed the livestock with the sale barn because the farmer retained ownership of the livestock.  Lamoni Livestock Sales, 417 N.W.2d at 448.  The Supreme Court of Iowa noted that possession is not defined in the UCC and looked to property law concepts for an analogy.  Id. at 447-48; see also Iowa Code § 554.9313, cmt. 3 (recognizing that "possession" is not defined and "adopt[ing] the general concept as it developed under former Article 9," which applied the principles of agency).

There is no reason to believe without some explicit indication that Iowa courts would construe the undefined term "possession" to include constructive possession in some sections of the Iowa UCC and not in others.  See Iowa Code § 554.1103(2) ("Unless displaced by the particular provisions of this chapter [referring to the Iowa

---

[3]This provision is now found at Iowa Code § 554.9102.  All references to § 554.9109 are to the 1987 version of the Iowa Code.

UCC], the principles of law and equity, including the law of . . . principal and agent . . . supplement its provisions."). Where the Iowa legislature intended to supplant the common law in the UCC, it specifically provided so. For example, in defining "control" for purposes of a certificated security in § 554.8106, the comments specify that control has a particularized meaning and is not to be interpreted by reference to other bodies of law. See Iowa Code § 554.8106 cmt. 7. The comment provides that "[i]n particular, the requirements for 'possession' derived from the common law of pledge are not to be used as a basis for interpreting subsection (c)(2) or (d)(2)" of § 554.8106. Id. Rather, "[t]hose provisions are designed to supplant the [common law] concepts of 'constructive possession' and the like." Id. This comment recognizes that the Iowa legislature intended courts to look to the common law to interpret undefined terms contained in the Iowa UCC, and that under the common law of Iowa, possession includes constructive possession.

The transfer of possessory rights as between the buyer and the seller is a logical point at which to sever the security interest held by the seller's lender when the seller sells its goods in the ordinary course of its business. See U.C.C. § 1-201, cmt. 9 ("The penultimate sentence prevents a buyer that does not have the right to possession as against the seller from being a buyer in ordinary course of business."); 9 William D. Hawkland, Richard A. Lord, Charles C. Lewis, & Frederick H. Miller, Hawkland UCC Series Art. 9 Appendix (Part II) (2008) ( suggesting that under the "amendment, a buyer will become a [BIOC] when the buyer becomes entitled to a possession remedy"). Construing possession to include constructive possession is consistent with this demarcation and with the purpose of the BIOC status. If § 554.1201(9) required physical possession to the exclusion of constructive possession, then a buyer who completed a sales transaction and placed goods with a bailee would not be considered a BIOC, but would continue to be subject to the lender's security interest. In this scenario, as between the buyer and the seller, the seller has no authority for regaining possession of the goods from the bailee, and the buyer clearly has the superior possessory interest as compared to the seller. Further, at this point, the lender is secured by the proceeds of the sale and no longer needs the security provided by the

goods themselves.  See GMAC Bus. Credit, L.L.C. v. Ford Motor Co. (In re H.S.A. II, Inc.), 271 B.R. 534, 541 (Bankr. E.D. Mich. 2002) ("[T]he reason that a security interest does not continue in collateral that is sold to a buyer in ordinary course is that the security interest continues in the proceeds, thus protecting the secured creditor."); see also 4 White & Summers-Uniform Commercial Code § 33-8(b) ("Normally a lender with a security interest in inventory intends the debtor to be able to sell the inventory free and clear.").

In this situation, we see no reason for the buyer not to receive the inventory free of the lender's security interest even though the buyer took constructive rather than physical possession of the goods.  The outcome should not differ based on whether the bailee is a third party or is the seller, where, as here, the buyer completes the sales transaction, the buyer takes delivery of the goods at the seller's premises, and the buyer and the seller explicitly agree that the seller will hold the goods for the buyer, such that the buyer constructively possesses the goods.  See Kunkel v. Sprague Nat'l Bank, 128 F.3d 636, 643 (8th Cir. 1997) (applying Kansas law and holding that under the UCC, a seller loses its Article 2 right to stop delivery when the goods are constructively delivered to the buyer via a bailee, even when the bailee is the seller); see also Havens Steel Co. v. Commerce Bank, N.A. (In re Havens Steel Co.), 317 B.R. 75, 87 (Bankr. W.D. Mo. 2004) (holding that constructive possession satisfies the "take possession" requirement under Missouri's UCC § 1-201(9)).  We hold that "possession" as used in Iowa UCC § 554.1201(9) includes constructive possession.

Having determined that the requirement in Iowa UCC § 554.1201(9) may be met through constructive possession, we turn to the separate issue of whether the Dealers satisfied the requirements of constructive possession under Iowa law.  The bankruptcy court concluded that the Dealers had constructive possession of the ag lime, but the BAP disagreed.  According to the BAP, under Iowa law a buyer has constructive possession of goods held by the seller only if the buyer takes "some visible and apparent step to inform the world of the change in possession from the [seller] to the [buyer]."  In re W. Ia. Limestone, Inc., 375 B.R. at 525-26 (discussing

Boothby & Co. v. Brown, 40 Iowa 104, 1874 WL 609 (1874); McAfee v. Busby, 28 N.W. 623 (Iowa 1886)). The Dealers assert that adoption of the UCC in the 1960s by the Iowa legislature rendered these cases inapplicable, and that more recent cases support their position that they could take constructive possession of the ag lime without notice to the secured creditor.

We agree with the Dealers that McAfee and Boothby do not control on the issue of whether constructive possession under Iowa law requires notice to the world of the change in ownership. Both cases involved application of an Iowa statute that specifically required notice when a seller retained actual possession: "'no sale or mortgage of personal property, where the vendor or mortgagor retains *actual possession* thereof, is valid against existing creditors or subsequent purchasers *without notice*, unless a written instrument conveying the same is executed and acknowledged like conveyances of real estate, and filed for record.'" McAfee, 28 N.W. at 623 (quoting Iowa Code § 1923 (1873)) (emphasis added). Iowa Code § 1923 explicitly required notice when the vendor retained actual possession. In McAfee, a husband claimed to have gifted a carriage to his wife to avoid a prior security interest. Id. at 623-24. The court determined that the husband retained actual possession based on the facts that the carriage was used for and by the entire family and that, at that time in Iowa's history, personal property used in the house occupied by the husband and wife was deemed to be in the possession and control of the husband. Id. at 624 (distinguishing Pierson v. Heisey, 19 Iowa 114 (Iowa 1865), where a father who gifted a piano to his daughter did not retain actual possession though the piano remained in his home because "[t]here was no pretense 'the father used the property as his own'"). Boothby relied on the same statute. See Boothby, 1874 WL 609, *1. Section 1923 was subsequently transferred to Iowa Code § 556.3 and repealed by the Iowa legislature in 1965. See Iowa Code § 556.3, historical notes (noting the repeal by Acts 1965 (61 G.A.) ch. 413, § 10102). Notably, this was the same time that the Iowa legislature initially adopted Iowa's UCC. See Iowa Code § 554.1201, historical notes (noting that the section was added by Acts 1965 (61 G.A.) ch. 413, § 1201).

Section 1923's notice requirement that applied to vendors who retained actual possession is no longer on Iowa's books. Without that statutorily mandated notice, we are left to determine what constitutes constructive possession under Iowa law, and particularly whether the BAP correctly concluded that notice to the world is required before a buyer can constructively possess goods left with the seller. The Supreme Court of Iowa has described constructive possession as follows: "[C]onstructive possession of personal property by its owner exists where the owner has intentionally given the actual possession–namely, the direct physical control–of the property to another for the purpose of having him do some act for the owner to or with the property." Lamoni Livestock Sales Co., 417 N.W.2d at 447-48. Ultimately, the court's discussion of constructive possession focused on the knowledge and agreement of the parties rather than notice to the world; where the parties agreed that one would hold direct physical control for another for the purpose of doing some act for the owner, the owner retained constructive possession. Id.; see also Gass v. Hettinga (In re Estate of Hettinga), 514 N.W.2d 727, 730 (Iowa Ct. App. 1994) (citing Lamoni Livestock Sales for the proposition that "[w]here the owner retains constructive possession, the party to whom bare physical control of the property had been entrusted for the owner's purpose does not have possession but only custody"); cf. U.C.C. § 1-201, cmt. 9 (explaining that the possession "requirement relates to whether *as against the seller* the buyer or one taking through the buyer has possessory rights").

Although construing a different section of the Iowa UCC, we find the court's discussion of constructive possession in Lamoni Livestock Sales instructive. The court relied on non-UCC law to construe the undefined term "possession," indicating that nothing peculiar to § 554.9109 warranted giving constructive possession a specialized meaning under that provision of Iowa's UCC law. Further, possession was determinative of whether a security interest continued or had been extinguished in Lamoni Livestock Sales, much the same as it is in the context in which we face it. We see no reason to treat constructive possession differently for purposes of § 554.1201(9) than the Supreme Court of Iowa treated it for purposes of § 554.9109. Finally, we are bound by a state supreme court's construction of its own law, and even

where there is no case directly on point by a state's highest court, we look to "relevant state precedent, analogous decisions, considered dicta, and any other reliable data" to determine how the Supreme Court of Iowa would construe Iowa law. See HOK Sport, Inc. v. FC Des Moines, L.C., 495 F.3d 927, 935 (8th Cir. 2007). We therefore use the concept of constructive possession under Iowa law as developed by the Supreme Court of Iowa's most recent discussion of it.

In this case, the bankruptcy court found that the ag lime was in existence at the time of the January and February bills of sale and that the identification by weight in each of the bills of sale sufficiently identified the ag lime to the contracts. (See Add. at 40 ("The product, in a particular pile, was identified to the contract . . ..").) See also Iowa Code § 554.2105(4) (2005) (providing that an undivided share in an identified bulk of fungible goods is sufficiently identified to a contract when the portion to be sold is identified by weight). The parties specifically contemplated that title would pass at the time of the bill of sale and that delivery would take place at WIL's quarry, where the ag lime would remain. (See Appellants' App. at 535, 536, & 542, each bill of sale containing the language: "And 'Seller,' in further consideration of the transfer and assignment, agrees to allow 'Buyer' to leave said Processed Ag Lime at the Logan Quarry until shipped to their clients.") The Dealers each filed affidavits stating that they inspected the ag lime and accepted it at WIL's place of business. It is undisputed that the Dealers paid for the ag lime at the time of acceptance. The bankruptcy court below found that title to the ag lime passed to the Dealers at the time of the sale, and United Bank does not contend otherwise. See Iowa Code § 554.2401(3)(b) (2005) (providing that "[u]nless otherwise explicitly agreed where delivery is to be made without moving the goods, if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting"); Sam & Mac, Inc. v. Treat, 783 N.E.2d 760, 764 (Ind. Ct. App. 2003) (explaining that title (and with it a possessory interest) passes from seller to buyer at the time and place the seller delivers the goods as agreed by the parties). Notably, this occurred in January and February of 2005, and each of the Dealers, without

restriction, removed portions of the ag lime from WIL's premises as it was resold to the Dealers' customers.

United Bank argues only that it had no notice of the sale of the inventory. Because notice is not a requirement for constructive possession under Iowa law, the BAP erred in concluding that constructive possession required notice to the world.[4] We hold that the Dealers constructively possessed the ag lime left at WIL's quarry based on the completed sale, the identification of the ag lime to the contract, and the agreement in the bill of sale between the Dealers and WIL that the ag lime would remain on WIL's premises until resold. See In re Havens Steel Co., 317 B.R. 75 at 87 (holding that the buyer's "possessory rights, arising from [its] payment for and title to the steel, were sufficiently strong to imbue [the buyer] with constructive possession of the steel, in the context of [Missouri UCC] § 1-201," where the steel was identified to the contract but held at the seller's warehouse).

Finally, United Bank argues that even if the Dealers took possession of the ag lime, they still are not entitled to BIOC status because the sales of ag lime were not conducted in a manner that was customary in WIL's business or in the industry. See § 554.1201(9) (to qualify as a BIOC "the sale [must] . . . comport[] with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices"). In the bankruptcy court proceedings, United Bank asserted that it was unusual for customers to prepay the ag lime contracts and to leave the ag lime on the quarry's premises. The bankruptcy court found that although WIL was new to the business of processing and selling ag lime through

---

[4]Related to its notice argument, United Bank claims that in determining its interest in WIL's inventory it relied on the fact that the ag lime was included in the pile remaining on WIL's premises. That claim is contrary to the record. The evidence demonstrates that WIL removed the total amount of the ag lime sold to the Dealers from its inventory records at the time of the sales. Further, there is no evidence that United Bank relied on the physical inventory–or that it even took a physical inventory that included the Dealers' ag lime–in assessing the strength of its security interest in WIL's assets.

-12-

dealers, the sales to the Dealers were conducted in a manner that was "a usual and customary practice in the industry."  (Add. at 36.)

We conclude that the bankruptcy court's finding is not clearly erroneous.  The evidence in the record consists primarily of contradictory affidavits filed by Gary Hopp, President and owner with his wife, Dianna, of WIL, and by Pete Horne, acting CFO and a director of WIL.  Mr. Hopp attested that most customers bought ag lime on credit and took immediate delivery, although a few customers prepaid their ag lime contracts and left the ag lime on the quarry's premises in early 2005.  Mr. Horne attested that Dianna and Gary Hopp directed him to develop a product development and marketing plan for the ag lime that was being produced as the by-product of a large asphalt project in late 2004; that he developed a plan to market the ag lime through exclusive dealerships; and that prepaid contracts became the normal custom for WIL as a result of the newly developed marketing plan.  He also attested that it was standard practice in the agricultural fertilizer business to conduct business in a similar manner.  Faced with the contradictory affidavits, the bankruptcy court credited Mr. Horne's affidavit and found the transactions at issue to be usual and customary in the industry.  This finding was further supported by the affidavits of Doug Welsh and Robert Bryant, who were also dealers of ag lime for WIL and who, like the Dealers here, paid for the ag lime in full and left the lime on WIL's premises until sold to their customers.  There being no other evidence in the record about the customary practices in the ag lime business, we cannot say that the bankruptcy court clearly erred in crediting one affidavit over the other.  See Dixon v. Crete Med. Clinic, P.C., 498 F.3d 837, 847 (8th Cir. 2007) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (internal marks omitted)).

III.

Because the Dealers satisfied the requirements of being buyers in the ordinary course of business under Iowa Code § 554.1201(9), we reverse the decision of the BAP and affirm the September 26, 2006, order of the bankruptcy court.

_____