LITWILLER MACHINE & MANUFACTURING, INC v NBD
ALPENA BANK

Docket No. 118425. Submitted April 10, 1990, at Grand Rapids.
Decided June 19, 1990.

Litwiller Machine & Manufacturing, Inc., was awarded a contract
to build thirty-nine boom assemblies for the defense depart-
ment. Litwiller entered into an agreement with Koss Indus-
tries, which had previously been awarded a contract for forty-
six identical boom assemblies, whereby Koss would produce the
thirty-nine assemblies for which Litwiller had the contract
from materials supplied by Litwiller. Litwiller supplied certain
steel components needed to produce the boom assemblies in
early 1985. While those components were not earmarked as
Litwiller's, the parties recognized that the Litwiller-supplied
components were owned by Litwiller and were for the Litwiller
boom assemblies. Koss defaulted on a note held by NBD Alpena
Bank, and the bank took possession of Koss' assets, including
the steel components that were to be used for the Litwiller
boom assemblies, pursuant to a perfected security interest
under a 1984 security agreement covering all of Koss' "inven-
tory, raw materials, work in progress and supplies owned or
hereafter acquired." Despite being aware of Litwiller's claim of
ownership of the components it had supplied, the bank sold the
components at a public sale. Litwiller brought an action
against the bank in Alpena Circuit Court for conversion of its
property. Both plaintiff and defendant moved for summary
disposition. The trial court, Joseph P. Swallow, J., granted
defendant's motion and denied plaintiff's, holding that the
components were part of Koss' inventory and were thus subject
to the perfected security interest created by the security agree-
ment in after-acquired goods. Plaintiff appealed.

The Court of Appeals *held:*

1. The secured transaction article of the Uniform Commercial
Code provides that a security interest attaches when (1) the

REFERENCES

Am Jur 2d, Secured Transactions §§ 156, 179.
See the Index to Annotations under After-Acquired Property or
Right; Inventories; Secured Transactions.

debtor has signed a security agreement describing the collateral, (2) value has been given, and (3) the debtor has rights in the collateral. There is no dispute that value has been given.

2. The security agreement described the collateral as including all after-acquired inventory. The components supplied by plaintiff for finishing and assembly constituted part of Koss' inventory within the meaning of the secured transaction article of the Uniform Commercial Code.

3. Koss had sufficient rights in the supplied components to permit the security interest to attach to those components.

4. Defendant had a perfected security interest in the components supplied by plaintiff to Koss.

Affirmed.

1. SECURED TRANSACTIONS — SECURITY INTERESTS — COLLATERAL — UNIFORM COMMERCIAL CODE.

A security interest under the secured transactions article of the Uniform Commercial Code attaches when (1) the debtor has signed a security agreement describing the collateral, (2) value has been given, and (3) the debtor has rights in the collateral (MCL 440.9204[1]; MSA 19.9204[1]).

2. SECURED TRANSACTIONS — INVENTORY — AFTER-ACQUIRED INVENTORY — UNIFORM COMMERCIAL CODE.

Components supplied to a subcontractor for fabrication by the subcontractor into a finished assembly become part of the inventory of the subcontractor for the purpose of the secured transactions article of the Uniform Commercial Code; the subcontractor has sufficient interest in such inventory to permit the inventory to become subject to the security interest created under a security agreement covering all of the subcontractor's inventory, raw materials and work in progress that is acquired subsequent to the agreement (MCL 440.9109[4], 440.9204[1]; MSA 19.9109[4], 19.9204[1]).

*Carl C. Silver,* for plaintiff.

*William S. Smigelski,* for defendant.

Before: REILLY, P.J., and MACKENZIE and SULLIVAN, JJ.

PER CURIAM. Plaintiff appeals as of right from an order denying its motion for summary disposition and granting defendant's motion for summary

disposition pursuant to MCR 2.116(C)(10). We affirm.

Plaintiff is in the steel fabrication business. In 1984, it was awarded a government contract for the production of thirty-nine boom assemblies for the defense department. Earlier, another steel fabrication company, Koss Industries, had also been awarded a contract for the production of forty-six identical boom assemblies. Since Koss was already set up for the fabrication of the assemblies under its contract, plaintiff contacted Koss to arrange for Koss' fabrication of the assemblies plaintiff had contracted to produce.

Plaintiff and Koss entered into an agreement whereby plaintiff would purchase the preformed steel components needed for the thirty-nine assemblies it was to produce. The components for plaintiff's contract would be shipped by the supplier directly to Koss. Koss would then fabricate all the boom assemblies for both contracts (a process involving lathing, milling, the addition of certain other components, welding, and painting), after which plaintiff would have the thirty-nine completed assemblies shipped to the government. Although the agreement was never reduced to writing, it appears from the affidavits of plaintiff's vice president that plaintiff would pay Koss for its fabrication services out of the proceeds of plaintiff's government contract, "less the favorable price differential obtained by . . . Plaintiff for Koss on [the] components shipped to Koss." Consistent with the agreement, plaintiff purchased the steel components and they were delivered to Koss. The components were not earmarked as plaintiff's upon their delivery to Koss in early 1985, although Koss and plaintiff understood that plaintiff owned components for thirty-nine of the eighty-five assemblies in Koss' possession.

Before Koss completed fabrication of the assemblies, it went into default on an earlier loan from defendant bank. The loan had been secured by security agreements granting defendant a security interest in "all [Koss'] inventory, raw materials, work in process and supplies now owned or hereafter acquired." It is undisputed that the bank's security interest was perfected prior to 1984.

The components for plaintiff's government contract remained at Koss' machine shop. In October, 1985, plaintiff informed defendant that plaintiff owned the components. The following month, defendant took possession of Koss' assets, including the components for the thirty-nine boom assemblies. Defendant subsequently sold the components at public sale. This action, alleging that defendant converted plaintiff's property, followed.

Plaintiff's contention is that the components were owned by plaintiff rather than Koss, so that defendant's security interest in Koss' after-acquired inventory could not attach to them. Defendant, on the other hand, contends that Koss had sufficient rights in the components to support defendant's claimed security interest. Like the trial court, we agree with defendant.

This case is governed by the provisions of Article 9 of the Uniform Commercial Code, MCL 440.9101 et seq.; MSA 19.9101 et seq. In order for the security interest granted by Koss to defendant to include the subject thirty-nine boom assembly components, the security interest must have attached to the goods. A security interest attaches to collateral when (1) the debtor (Koss) has signed a security agreement describing the collateral, (2) value has been given, and (3) the debtor has "rights in the collateral." MCL 440.9204(1); MSA 19.9204(1). The second requirement is not disputed in this case; the question is whether the compo-

nents were part of Koss' after-acquired inventory described in its security agreement with defendant, and, if so, whether Koss had sufficient rights in the boom assembly components to meet the third requirement.

The question whether components which have been supplied to a manufacturer for fabrication constitute inventory of the manufacturer was addressed in *Morton Booth Co v Tiara Furniture, Inc,* 564 P2d 210 (Okla, 1977). The facts in *Booth* are similar to those of this case. Tiara and Booth had a contract whereby Booth supplied to Tiara most of the components for the manufacture of gun cabinets. Tiara supplied additional lumber and built the cabinets for Booth. Booth then paid Tiara for the finished product. When Tiara defaulted on certain bank loans secured by its after-acquired inventory, the banks attempted to enforce their security interests by taking possession of Tiara's inventory, including the components supplied by Booth. The *Booth* court concluded that the components were part of Tiara's inventory:

> Booth argues that both the security agreement and the financing statement executed by Tiara in favor of [the] Banks describes the collateral as "inventory" and the raw materials "furnished" by Booth were never a part of Tiara's assets or inventory. Booth speaks of inventory in its accounting sense as if it were synonymous with "inventory" as a term of art when used in the Code. This is not necessarily the case. The Code defines "inventory" as being goods "held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business." 12A O.S.1971, § 9-109(4). The goods in question were definitely "raw materials, work in process or materials used" in Tiara's business. Whether the raw materials

> supplied by Booth ever appeared on Tiara's books
> as "assets" or "inventory" for any purpose has no
> bearing on whether they are inventory for the
> purposes of the Code. [564 P2d 213.]

The definition of "inventory" under the Michigan
UCC is identical to the definition applied in *Booth.*
See MCL 440.9109(4); MSA 19.9109(4). Applying
*Booth* to this case, we conclude that plaintiff's
components were a part of Koss' inventory, and
thus were described in the security agreement
between Koss and defendant. The first require-
ment for defendant's security interest to attach to
the components is satisfied.

We next consider the third requirement for
attachment of defendant's security interest to the
components, that the debtor (Koss) must have
sufficient "rights in the collateral." Plaintiff con-
tends that Koss was a mere bailee of plaintiff's
components. Defendant contends that Koss had a
greater interest in them.

The phrase "rights in the collateral" is not
defined in the UCC. The UCC, however, does not
require that a debtor have full ownership rights.
See, e.g., MCL 440.9112; MSA 19.9112. Indeed, title
to goods is of little relative consequence under the
UCC. *Booth, supra,* 564 P2d 212. A deliberate effort
was made by the drafters of the UCC to avoid
defining the rights of the parties to goods in terms
of who has title. *Id.*

The *Booth* court described "rights in the collat-
eral" as follows:

> [M]ere possession of goods is not enough under
> the Code to demonstrate that the debtor had
> "rights" in the collateral. . . . The provisions of
> Article 9 were never intended to give rise to a
> security interest where the debtor was, for exam-
> ple, a mere gratuitous bailee. The cases generally

hold, however, that where a debtor gains posses-
sion of collateral pursuant to an agreement endow-
ing him with any interest other than naked pos-
session, the debtor has acquired such rights as
would allow the security interest to attach. [564
P2d 214.]

In *Booth,* the court concluded that Tiara had
rights in the materials supplied by Booth beyond
mere possession: it had the right to incorporate
the materials into a product for sale, to use the
materials, and to sell the finished product to
Booth. This was sufficient to allow the banks'
security interest to attach.

In *State Bank of Young America v Vidmar Iron
Works, Inc,* 292 NW2d 244 (Minn, 1980), Vidmar, a
metal shop, contracted to have another company,
Adaptable Industries, Inc., do its overflow work.
The contracts involved paying Adaptable to do
fabricating work on raw materials supplied by
Vidmar. Adaptable defaulted on a bank loan se-
cured in part by its after-acquired inventory, and
the bank sought to enforce its security interest
against the materials supplied by Vidmar. The
*Vidmar* court stated:

> This court has never considered whether the
> rights of one in Adaptable's position are sufficient
> to allow a security interest to attach. However, in
> *James Talcott, Inc v Franklin National Bank,* 292
> Minn 277; 194 NW2d 775 (1972), this court held
> that a security interest could attach to property
> purportedly leased by the debtor. Looking to the
> substance of the transaction, the court held that
> ownership for Article 9 purposes was not depen-
> dent upon formal title. The court stated:
> "[T]he draftsmen of the code intended that its
> provisions should not be circumvented by manipu-
> lation of the locus of title. For this reason, consign-
> ment sales, conditional sales, and other arrange-

ments or devices whereby title is retained in the seller for a period following possession by the debtor are all treated under Art. 9 as though title had been transferred to the debtor and the creditor-seller had retained only a security interest in the goods." 292 Minn at 285; 194 NW2d at 781. [292 NW2d 250.]

The *Vidmar* court concluded that Adaptable had sufficient rights in the material supplied by Vidmar to allow the bank's security interest to attach. Adaptable had contract rights in the goods to the extent of the amount due for its work and had a statutory mechanic's lien in the goods to secure it.

Another case factually similar to this case is *Kinetics Technology International Corp v Fourth National Bank of Tulsa,* 705 F2d 396 (CA 10, 1983). There, Kinetics (KTI), a furnace manufacturer, entered into a contract with OHT under which OHT was to build furnace economizers in part from materials supplied by KTI. Before the contract was completed, OHT shut down and surrendered possession of the materials supplied by KTI to a bank which had a security interest in OHT's after-acquired inventory. The *Kinetics* court applied *Booth*'s holding that a debtor has rights in the collateral when it has "any interest other than naked possession," and concluded that the bank's security interest attached to KTI's goods. The *Kinetics* court observed:

> The *Morton Booth* definition strongly supports the Article Nine purpose of promoting certainty in commercial loan transactions. *See* UCC, § 9-101, Official Comment. Otherwise, if a debtor received collateral from a third party under an agreement giving the debtor authority to exercise any outward indicia or manifestations of ownership or control, a would-be creditor could easily be misled into making a loan under an ineffective security

agreement. For example, in *Morton Booth, . . .* [h]ad the court found that Tiara lacked sufficient "rights" in the Morton Booth-supplied collateral for the banks' security interest to attach, the banks' claim to the goods upon Tiara's default would have been defeated by the sort of hidden-title subterfuge the Code was intended to prevent.

This reason for the *Morton Booth* result is supported by another feature of Article Nine. In this context, buyers such as Morton Booth and KTI finance a debtor's operation by supplying materials rather than money with which to buy materials. Such a buyer-lender could easily protect itself from after-acquired property creditors of its contractor by filing an Article Nine purchase money security interest in the goods supplied by it to the contractor, as well as those purchased or otherwise identified in the contract by the contractor. *See* tit. 12A, §§ 9-107, -312(3). Requiring buyers such as KTI to take this additional step—done easily and at minimal cost—thoroughly advances the Code policy of providing notice and certainty to inventory lenders. [705 F2d 399-400.]

In this case, we conclude that Koss had sufficient rights in the components supplied by plaintiff so that defendant's security interest attached to those components. As in *Vidmar,* Koss had contract rights to the goods to the extent of the amount due for its work and could impose a lien on the goods to enforce that right. See MCL 570.186; MSA 26.402; *Nickell v Lambrecht,* 29 Mich App 191; 185 NW2d 155 (1970). As in *Booth,* Koss had the right to use and incorporate the components for what must be characterized as a sale of the completed assemblies to plaintiff. This amounts to more than "naked possession" of the components.

On the basis of the above, we conclude that defendant's security interest in Koss' after-acquired inventory attached to plaintiff's components. The parties do not dispute that the security

interest was perfected prior to 1984. As pointed out in *Kinetics, supra,* a supplier of components such as plaintiff has a purchase money security interest in the components. *Kinetics, supra,* 705 F2d 399. See also *Vidmar, supra; Booth, supra.* In this case, plaintiff took no steps to perfect its security interest. Under MCL 440.9312; MSA 19.9312, therefore, defendant's perfected security interest in the components had priority over plaintiff's unperfected security interest. The trial court properly granted summary disposition in favor of defendant.

Affirmed.