KENNEDY, Circuit Judge.
Defendant Ford Motor Company (“Ford”) appeals from the district court’s order affirming bankruptcy court’s order granting summary judgment in favor of Plaintiff GMAC Business Credit (GMACBC) in this dispute over financing and sales transactions during a bankruptcy. We AFFIRM.
BACKGROUND
On February 2, 2000, H.S.A. II (“Debtor”) filed its Chapter 11 petition. On February 3, 2000, the bankruptcy court entered an interim order for post-petition financing pursuant to which GMAC-BC would provide financing to Debtor for the production of parts in exchange for a first priority perfected security interest (“PSI”) in all property of the estate acquired by Debtor after the petition, including inventory, raw materials and finished goods. On April 3, 2000, the court entered a final financing order.
On April 21, 2000, Debtor and Ford entered into a separate financing order, approved nunc pro tunc by the court. Apparently, Debtor and Ford had earlier been operating under an agreement that had not been approved by the court. The agreement provided that Ford would (1) purchase and supply all steel to be used by Debtor for the production of Ford’s parts and (2) make advance payments to Debtor to cover overhead and costs attributable to the production of Ford parts. Upon completion of the parts, Debtor would invoice Ford, who would then pay the amount of the invoice, less the cost of steel. Ford also had an administrative expense claim for the advance payments and reserved the right to recoup or set off the advance payments against Ford’s accounts payable.
Debtor ceased operations on June 20, 2000. At that time, it had in its possession approximately $150,000 in work in process for Ford, $1,034,351.65 in finished goods for Ford, and $273,960.26 in raw materials (steel) provided by Ford. On June 20, 2000, Ford sent six trucks to Debtor’s premises to pick up the finished goods. Debtor’s employees refused to release them. Eventually, Debtor’s owner was contacted and he authorized the employees to cooperate with Ford. By that point, however, only one truck was available to remove the property. The following day, Ford sent additional trucks to pick up the remaining finished goods but were stopped by GMAC-BC’s representatives who halted the removal. GMAC-BC’s counsel faxed a letter to Ford on June 22, 2000, informing Ford that Debtor was instructed not to release any Ford-related property unless Ford agreed that it would pay for this property without any set-offs against amounts owed by Debtor to Ford (i.e., the cost of steel and advance payments for costs attributable to the parts). As a justification, GMAC-BC asserted that it had a first PSI in all of Debtor’s inventory (i.e. *406 raw materials, work in process, and finished goods).
GMAC-BC sued to determine the validity, priority and extent of its hen on Debt- or’s inventory. Ford filed a counterclaim against GMAC-BC and a cross-claim against Debtor, asserting that the refusal by GMAC-BC and Debtor to allow Ford to take possession of the inventory constituted conversion for which GMAC-BC and Debtor are liable for treble damages. The bankruptcy court found, on cross-motions for summary judgment, that GMAC-BC has priority over any interest asserted by Ford. The district court affirmed and Ford appealed to this Court.
ANALYSIS
On this appeal, Ford argues that the bankruptcy court and the district court erred by finding that (1) there was no authorized final sale of finished goods to Ford, (2) if there were a sale, Ford is not a buyer in the ordinary course of business, and (3) even if there was no sale, that Ford was not a bailor with respect to the inventory. Ford also argues that if this Court agrees with any of its positions, it should find GMAC-BC and Debtor liable for conversion of Ford’s property.
I. There was no authorized final sale of ñnished goods
The bankruptcy court found that GMAC-BC, in general, authorized the sale of finished goods from Debtor to Ford. It found, however, that there was no sale with respect to the finished goods that were on the Debtor’s premises on June 20, 2000. The district court agreed that there was no sale and did not reach the question of authorization. Because we agree that there was no sale, we also do not reach the question of authorization.
“A ‘sale’ consists of the passing of title from the seller to the buyer for a price ...” Mich. Comp. Laws § 440.2106(1). Passing of title occurs “in any manner and on any condition agreed on by the parties.” Mich. Comp. Laws § 440.2401(1). The rule on the passing of title is subject to the provisions of the article on secured transactions (Article 9). Id. The agreement between Debtor and Ford, approved by the bankruptcy court, contained a standard Ford’s purchase order (“PO”) delivery term “FOB Carrier Supplier’s [Plant].” The two courts below concluded, as a matter of law, that since the goods were not delivered to a carrier at the Supplier’s (i.e. Debtor’s) plant, title did not pass (and, consequently, no sale) occurred. We agree. Ford asserts that both courts erred because “[i]n Michigan, whether and when title to goods passes is a question of fact.” Appellant Br. at 24 (citing Sherwood v. Walker, 66 Mich. 568, 33 N.W. 919 (1887) and Blodgett v. Hovey, 91 Mich. 571, 52 N.W. 149 (1892)). However, neither case applies here. In Sherwood, the contract did not specify when the title passed and so the court had to look at the parties’ intent. Sherwood, 33 N.W. at 920 (quoting from the letters exchanged by the parties). In Blodgett, the court discussed the general rules about when the title passes and then stated that “these are only rules for the construction of the agreement, they must yield to anything in the agreement which clearly shows a contrary intention.” Blodgett, 52 N.W. at 150.
Ford also argues that the parties’ conduct in this case showed that they had modified or waived the delivery term of the PO to complete the sale of the finished parts at Debtor’s plant. The agreement between Ford and Debtor, as approved by the bankruptcy court, however, expressly forbids any waiver, alteration, modification, or amendment of the agreement un *407 less it is done in writing. J.A. at 218. Although the April 21, 2000 bankruptcy order did not specifically mention the delivery term, it did specifically incorporate the underlying written agreement between Ford and Debtor. J.A. at 204. Furthermore, the underlying agreement incorporated the Ford Purchase Order. J.A. at 206. Taken together, all these contractual provisions mean that Debtor lacked the ability to waive the delivery term.[1] Having resolved this issue on the basis of clear and unambiguous language of the contract, we find it unnecessary to decide whether or not the Debtor’s owner had the authority to waive a term in a court-approved contract prior to June 20, 2000, and thereby create a new unapproved contract.[2]
The result reached in this case may appear harsh and overly technical, but this Court has before it a contract entered into by two sophisticated parties. Ford should have foreseen the possibility that Debtor, a company already mired in the midst of a bankruptcy, may cease its operations at any point in time. Ford’s failure to protect itself through an acceptable agreement with GMAC with respect to finished parts (and also raw materials and work-in-process inventory) is either an oversight of its attorneys who drafted the agreement or Ford’s failure to reach a compromise with GMAC during the negotiations. This Court finds that neither reason provides sufficient justification for us to ignore the plain and unambiguous language of the contract.
Ford’s counsel urged us to exercise our equitable powers to reach a different result. We refuse to do so. GMAC had a first priority PSI in all of Debtor’s estate, including inventory. Ford could have negotiated with GMAC an adequate protection for Ford’s parts and it may have even attempted to do so. However, the absence of any such agreement shows that either no such negotiation was ever attempted or that it was explicitly reject by GMAC. In either case, GMAC had a clear (and justifiable) expectation that it would maintain a first priority PSI over everything in Debt- or’s possession. It would be inequitable to deprive it of this expectation.
Our finding that there was no sale of finished goods renders it unnecessary for us to consider the question of authorization and the question of whether or not Ford is a buyer in the ordinary course of business.
II. Bailment
Ford also asserts that Debtor was a bailee with respect to the steel supplied by Ford and that, accordingly, Debtor did not have sufficient rights in the collateral for the security interest to attach. The bankruptcy and the district courts rejected this argument. As the district court noted, under Michigan law, “ ‘bailment’ imports the delivery of personal property by one person to another in trust for a specif *408 ic purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished.” In re H.S.A. II, Inc., No. 02-70297, slip op. at 5-6 (E.D.Mich. Sept. 30, 2002) (quoting In re Zwagerman, 115 B.R. 540, 547 (Bankr. W.D.Mich.1990) (emphasis added)).
The bankruptcy court found that Debtor was not merely a bailee by quoting an Oklahoma case cited with approval by a Michigan case:
[M]ere possession of goods is not enough under the Code to demonstrate that the debtor has “rights” in the collateral. ... The provisions of Article 9 were never intended to give rise to a security interest where the debtor was, for example, a mere gratuitous bailee. The cases generally hold, however, that where a debtor gains possession of collateral pursuant to an agreement endowing him with any interest other than naked possession, the debtor has acquired such rights as would allow the security interest to attach.
Morton Booth Co. v. Tiara Furniture Inc., 564 P.2d 210, 214 (Okla.1977) (quoted in Litwiller Mach. & Mfg., Inc. v. NBD Alpena Bank, 184 Mich.App. 369, 457 N.W.2d 163 (1990) (emphasis added)). The bankruptcy court found that since “the debtor had the right to use the steel supplied by Ford for the production of Ford parts and then to sell the parts back to Ford[, t]his is more than mere ‘naked possession’ of the supplied steel.” In re H.S.A. II, Inc., 271 B.R. 534, 543, slip op. at 13 (Bkrtcy.E.D.Mich. 2002). Ford argues that the bankruptcy court erroneously relied upon non-bankruptcy cases and ignored specific bankruptcy law that a bailor has right superior to those of a lender secured by assets of a bankruptcy estate. The crux of Ford’s argument is that GMAC-BC had a PSI in the property of the estate and, accordingly, it is “immaterial whether Debtor had some minimal interest in the Supplied Material as sufficient for attachment of a security interest. The issue in this case is not ‘attachment’ under the UCC, but rather ‘property of the estate’ under the Bankruptcy Code.” Appellant Br. at 49. We disagree that the difference between the two terms is significant in this case. GMAC-BC had a PSI in all property of the estate acquired by Debtor post-petition, including inventory, raw materials and finished goods. J.A. at 36-7. A security interest therefore would have attached to the collateral (inventory) if (1) Debtor had signed a security agreement describing the collateral, (2) value had been given, and (3) the debtor had “rights in the collateral.” Mich. Comp. Laws § 440.9204(1). The first two requirements are clearly satisfied in this case. The question thus is whether or not Debtor had “rights in the collateral.” Stated differently, whether or not GMAC-BC’s security interest attached to the supplied steel depends on whether or not Debtor was a bailee with respect to that steel. Ford argues that a “ ‘special purpose’ ” in the definition of bailment under Michigan law is clearly more than mere possession. Appellant Br. at 24. Although we agree that “special purpose” could be more than mere possession, we do not believe that “transformation of an item” could be a “special purpose.” Ford have been unable to point to any Michigan cases that would support their theory that when a raw material is provided by one party to the other for creation of a wholly new product, the raw material is considered a “bailed item.”[3] On the contrary, the classic case of a bailment that involves *409 more than mere possession is loaning an item of personal property, such as an automobile, for the use by the bailee. See, e.g., Godfrey v. City of Flint, 284 Mich. 291, 279 N.W. 516, 517 (1938) (defining bailment as giving “to another the temporary use and possession of property ... the latter agreeing to return the same at a future time.”) (quoting 8 C.J.S. Bailments, p. 243, § 8). Ford’s insists that a “bailment under Michigan law may require of the bailee more than mere possession, such as transforming the bailed property into finished automotive parts.” Appellant Br. at 24. The Michigan Court of Appeals rejected this very argument when it held that more than a “naked possession” resulted from the situation where the debtor “had the right to use and incorporate the components for what must be characterized as a sale of the completed assemblies to plaintiff.” Litwiller, 184 Mich.App. 369, 457 N.W.2d 163, 167 (1990). The Litwiller court went on to find that “rights in the collateral” attached once the debtor had more than mere “naked possession.” Accordingly, we find that no bailment was created in this case.
The district court found that the agreement between Debtor and Ford was a sale of parts on credit and not a bailment agreement for three other reasons. First, it read the relevant agreement provisions as supporting a financing agreement only because “[i]f this were truly a bailment agreement, one would expect Ford to absorb the costs of the parts and pay H.S.A. II for the work done instead of deducting the cost of the supplied material from its accounts payable.” In re H.S.A. II, Inc., No. 02-70297, slip op. at 6 (E.D.Mich. Sept. 30, 2002) (also noting that the court-approved agreement did not discuss any bailment agreement). Second, it held that since “the bankruptcy court’s approval of the Ford order was based on 11 U.S.C. § 364(b), a section allowing the trustee to incur unsecured debt,” Ford “cannot now recharacterize the supplied material provision of the Supply Protection Agreement as a bailment agreement.” Id. Third, it rejected the unsigned bailment agreement presented by Ford because it was dated June 12, 2000, two months after the bankruptcy court approved the agreement, and because it was not signed by Debtor. According to the district court, “the bankruptcy court did not approve a bailment agreement, it only approved a financing agreement under 11 U.S.C. § 364(b), and subsequent documents cannot change the nature of the bankruptcy court order.” Id. Ford argues that the district court erred in several respects. First, it asserts that the rejection of the bailment agreement because it was unsigned is unwarranted in this case since both sides had signed copies and it was only by mistake that an unsigned copy was attached to the pleadings. Appellant Br. at 45. Second, it takes issue with the District Court’s statement that “[i]f this were truly a bailment agreement, one would expect Ford to absorb the costs of the Supplied Material and pay Debtor for the work done instead of deducting the costs of the supplied material from its accounts payable” by insisting that it is precisely what it did. Appellant Br. at 46. Third, it asserts that “[njeither the Bankruptcy Code nor case law requires that a bankruptcy court must approve a debtor’s post-petition bailment agreement.” Appellant Br. at 46. We do not decide these issues because, as explained above, we find, based on the nature of the arrangement, that no bailment was created in this case.
CONCLUSION
For the reasons stated above, we affirm the decision of the district court.

. This conclusion is further buttressed by another provision in the Agreement that expressly states that the "parties shall not by any act, delay, indulgence, omission or otherwise be deemed to have waived any ... breach of the terms and conditions of this Agreement.” J.A. at 218.

. Cf. In re Cent. Fla. Metal Fabrication, Inc., 190 B.R. 119, 123 (Bankr.N.D.Fla. 1995) (finding that "the Code's provisions do not allow a debtor in possession to either expressly or impliedly assume an executory contract without court approval”); In re UNR Indus., Inc., 71 B.R. 467, 477 (Bankr.N.D.Ill.1987) (finding that Chapter 11 Debtor's waiver of an affirmative defense is irrelevant because "it is clear under the Bankruptcy Code and Rules that such a waiver would not prevent any other interested party such as ... an individual creditor from objecting to the [other creditors'] claims on the basis” of that affirmative defense) (citing 11 U.S.C. § 502(a); Bankruptcy Rules 3007, 3008).

. We respectfully disagree with the concurring judge in In re Bristol Industries Corporation, 690 F.2d 26, 31 (1982), at least as a matter of state law, as explained below.