**In re HATFIELD 7 DAIRY, INC., Debtor.**

**No. 08–61009.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

March 9, 2010.

Michael T. Gunner, Hilliard, OH, for Debtor.

Lawrence Hackett, Columbus, OH, for U.S. Trustee.

David A. Beck, Jones Day, Fordham E. Huffman, Columbus, OH, for Creditor Committee.

## *MEMORANDUM OPINION AND ORDER ON MOTION OF STOLL FARMS, INC. FOR RELIEF FROM THE AUTOMATIC STAY*

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

### I. Introduction

This matter arises in the bankruptcy case of Hatfield 7 Dairy, Inc. ("Hatfield Dairy" or "Debtor") and is before the Court on the motion for relief from the automatic stay ("Motion") (Doc. 235) filed by Stoll Farms, Inc. ("Stoll"). By the Motion, Stoll seeks to recover 3,000 tons of corn silage ("Silage") from the Debtor. The Debtor's lender, The Bath State Bank ("BSB"), has filed an objection to the Motion ("Objection") (Doc. 247), asserting that it has a blanket lien that encumbers substantially all of the Debtor's assets, including the Silage. According to BSB, its blanket lien trumps Stoll's interest, if any, in the Silage.

Stoll contends that it should prevail because it purchased the Silage not from Hatfield Dairy but from Hendren Farms ("Hendren"). The evidence, however, establishes that Stoll entered into an agreement to purchase the Silage from Hatfield Dairy, not from Hendren. Stoll could have taken steps to become a buyer of the Silage from Hatfield Dairy in the ordinary course of business, thereby obtaining priority over the liens of BSB, but Stoll did

not do so. The Court, therefore, concludes that Stoll is not entitled to relief from the automatic stay.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(G).

This memorandum opinion contains the Court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52 (made applicable in this contested matter by Fed. R. Bankr.P. 7052 and 9014(c)).

## III. Background

Based on its review of the docket in this case as well as the evidence introduced at the hearing on the Motion, the Court makes the findings of fact set forth below.

The dispute over the Silage arises from BSB's and Stoll's separate transactions with Hatfield Dairy prior to Hatfield Dairy's commencement of its bankruptcy case. BSB financed Hatfield Dairy's operations pursuant to an Agricultural Security Agreement dated March 5, 2008 ("ASA"), which granted BSB a lien on substantially all of Hatfield Dairy's assets, including "any and all farm products, harvested crops and all processed crops, whether or not produced by [Hatfield Dairy.]" In connection with its dairy-farm operations, Hatfield Dairy fed corn silage to its cows. Corn silage is produced by cutting and chopping standing corn until it resembles green wood chips. The silage then ferments through a natural process and is stored either in grain silos or under cover on storage pads, where it remains until it is needed to feed cattle. Thus, as BSB and Stoll agree, the Silage is a farm product. Stoll also grew corn and fed corn silage to its cows. Beginning in the early to mid part of the 2000s, however, Stoll was sometimes unable to produce an adequate supply of corn silage for its own herd. When it was confronted with a silage shortfall, Stoll would contact Hatfield Dairy and, over the course of the next few years, Hatfield Dairy would deliver to Stoll several thousand tons of corn silage that Hatfield Dairy produced from its own standing corn. In 2008, Stoll again faced a shortage of corn silage. Following a series of discussions between the principal of Stoll (Edward Stoll) and Gail Hatfield ("Mr. Hatfield")—who was the business manager responsible for Hatfield Dairy's day-to-day business transactions involving crops and animal feed—Stoll and Hatfield Dairy entered into an agreement ("Silage Agreement") under which Stoll agreed to purchase the Silage from Hatfield Dairy, with the Silage to be stored by Hatfield Dairy and delivered to Stoll beginning in the winter of 2008–09 and continuing into the spring of 2009.

Hatfield Dairy's invoice issued in connection with the Silage Agreement, which is dated September 26, 2008, stated:

Hatfield 7 Dairy Inc.
P.O. Box 346
Croton, Ohio 43013–0346

| Bill To: | | Date | Invoice # |
|---|---|---|---|
| Stoll Farms | | 9/26/2008 | 1582 |
| 6818 Coal Bank Road | | | |
| Marshallville, OH 44645 | | | |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 4,000 | Delivery of 4000 tons of corn silage | 65.00 | 260,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| Less 75% prepayment | | | | –195,000.00 | –195,000.00 |

Payment Date 9-30-08 Check# 45702
Balance due as deliveries made per Mr. Ed Stoll
Balance due listed as total

| | | | | Total | $65,000 |
|---|---|---|---|---|---|

Stoll issued to Hatfield Dairy a document dated September 30, 2008 that stated:

Stoll Farms, Inc.

| Invoice # | Date | Description | Account | Balance Due | Amount Paid |
|---|---|---|---|---|---|
| 1582 | | 3000 ton corn silage | CORN SILAGE | 0.00 | $195,000.00 |
| Date: | 9/30/2008 | Paid To: Hatfield Dairy | | | $195,000.00 |
| | | Paid By: Stoll Farm, Inc. | | | |

At the time it entered into the Silage Agreement, Hatfield Dairy did not have sufficient stores of corn silage to provide any to Stoll and did not have adequate acres of standing corn to produce additional silage from its own crops. When Mr. Hatfield advised Mr. Stoll of the situation, they discussed the possibility of Hatfield Dairy obtaining silage from another crop farm or farms in order to fulfill Stoll's silage requirements. Thereafter, Hatfield Dairy arranged to purchase standing corn from Hendren and to cut that standing corn to produce the Silage. Neither the Stoll document nor the Hatfield Dairy invoice referenced Hendren. There were no agreements between Stoll and Hendren. Nor is there any evidence that Hatfield Dairy brokered any agreement between Stoll and Hendren. In fact, the evidence introduced at the hearing did not clearly show that Hendren was even aware of Hatfield Dairy's plans for the standing corn it purchased from Hendren or that Stoll was aware of who Hatfield Dairy was dealing with to obtain the Silage.

Hendren required that Hatfield Dairy tender a cashier's check before Hatfield Dairy could begin cutting the corn. On September 20, 2008, Mr. Hatfield picked up a cashier's check issued by Stoll to Hatfield Dairy in the amount of $195,000, which Mr. Hatfield then deposited into one of Hatfield Dairy's bank accounts at Heartland Bank. No agreements or other documents were exchanged between Hatfield Dairy and Stoll with respect to the transactions described above (other than the cashier's check from Stoll to Hatfield Dairy, the Hatfield Dairy invoice and the Stoll document discussed above). The $195,000 that Hatfield Dairy received from Stoll was for the Silage itself, storage of the Silage and delivery of the Silage. Hatfield Dairy then provided a cashier's check drawn on its Heartland Bank account to Hendren in the amount of $116,550 for the standing corn so that Hatfield Dairy could begin cutting the corn.[1] Because the corn was of better quality than Hatfield Dairy expected, it was not necessary to cut (and

1. Workers hired by Hatfield Dairy and acting on its behalf chopped the corn into silage and hauled the resulting product away. The Silage was then stored at facilities of the Debtor (or affiliated with the Debtor); a portion of the Silage was stored in a silo and the remainder on a storage pad commingled with some of Hatfield Dairy's own silage.

Hatfield Dairy did not cut) as many acres as was provided for in the contract between Hatfield Dairy and Hendren. Accordingly, Hendren paid a portion of the $116,550 back to Hatfield Dairy. Hatfield Dairy, however, did not return any funds to Stoll because Hatfield Dairy had agreed to provide to Stoll specified tons of corn silage, not acres of standing corn.

Mr. Hatfield testified that the arrangement with Stoll regarding the storage of the Silage was that Hatfield Dairy would store the Silage on its farm until the winter months and then start to haul the Silage to Stoll's farm. Mr. Hatfield testified that it was never his intention (on behalf of Hatfield Dairy) to take ownership of the Silage. Mr. Hatfield did not testify as to Mr. Stoll's intention, and Mr. Stoll did not testify.

In addition to other borrowings secured by the ASA, Hatfield Dairy obtained an additional $136,500 from BSB in order to have sufficient funds to purchase standing corn to turn into silage for its own operations. Hatfield Dairy also purchased this standing corn from Hendren.

Hatfield Dairy filed a bankruptcy case on November 7, 2008 ("Petition Date"). On its Statement of Financial Affairs filed on November 21, 2008 (Doc. 30), in response to Question 14 ("Property held for another person"), the Debtor listed Stoll and stated as follows:

> corn silage $195,000.00 Stoll Farms paid Hatfield 7 Dairy Inc. to produce standing corn; harvest the standing corn for corn silage, store it and then delivery [sic] in the winter of 2008 and 2009. from [sic] htis [sic][H]atfield 7 Dairy purchased additional corn acres over and above what was grown.

As Mr. Hatfield testified, this was not an entirely accurate statement because Hatfield Dairy actually agreed to produce corn silage, not standing corn, for Stoll. It was Hendren that produced the standing corn.

The Debtor commenced its case under Chapter 12 as a family farmer case. BSB filed a motion to dismiss the case on the basis of ineligibility (Doc. 16). Ultimately, the Debtor and BSB agreed that the case would be converted to Chapter 11, and the Court entered an agreed order converting the case (Doc. 42). BSB also filed a motion to prohibit the use of cash collateral (Doc. 19), after the Debtor used BSB's cash collateral to fund its farming operations without first obtaining its consent or authority from the Court. In response, the Debtor filed a motion to use cash collateral (Doc. 39). The parties reached an agreement on the use of cash collateral after the Court commenced a hearing; following the hearing, the Court entered a first agreed interim order authorizing the use of cash collateral (Doc. 57). The parties eventually reached agreement on, and the Court approved, a second interim cash collateral order (Doc. 77), as well as a third ("Third Interim Order") (Doc. 114). Each of these orders provided that, as adequate protection to BSB for the use of its cash collateral, BSB would have replacement liens on most of the Debtor's personal property (other than avoidance actions arising under Chapter 5 of the Bankruptcy Code), including "any and all farm products, harvested crops and all processed crops, whether or not produced by Debtor" and "any and all of Debtor's present and future farm products . . . of every type and description (including milk). . . ." See Third Interim Order ¶ 9(g) & (h).

In mid-December 2008 (after the Petition Date), Mr. Stoll contacted Mr. Hatfield about commencing delivery of the Silage. At that time, Mr. Hatfield informed Mr. Stoll of the bankruptcy case, and the Silage stayed in the silo and on the pad under Hatfield Dairy's control, where

it remains to this day. None of the Silage was delivered to Stoll and, if it were delivered, the Silage would be subject to rejection by Stoll if the Silage were not suitable as feed. Mr. Stoll later sent a letter to attorney Rick Ricketts, counsel for BSB, which stated in pertinent part:

> In September of 2008 Stoll Farms, Inc. entered into an agreement to purchase 4,000 tons of corn silage from [Gail] Hatfield (Hatfield Dairy) to be delivered to Stoll Farms, Inc. from December 08 through April 2009 at $65.00 per ton. Stoll Farms, Inc. also agreed to pay 75% down prepayment, which we paid on 9–30–08 (as you can see on the document sent with this fax). With the agreement that the prepaid silage would be delivered first and the last 25% to be paid on a per delivery basis.

The letter referred to "an agreement to purchase" the Silage, not a brokerage or bailment arrangement. The letter from Mr. Stoll to Mr. Ricketts did not mention Hendren. During the hearing, Mr. Hatfield conceded that Hatfield Dairy bought standing corn from Hendren and that what Stoll was buying was corn silage, not standing corn.

After Mr. Stoll sent the letter to Mr. Ricketts, Stoll filed its Notice of Stoll Farms, Inc., an Interested Party, of Its Intention to Retrieve and Move Property Held by Debtor ("Notice of Intention") (Doc. 210). Stoll stated therein that it was "now interested in retrieving and moving its corn silage" and that the "Debtor has given its approval for Stoll to retrieve its corn silage." Notice of Intention at 1. BSB filed an objection (Doc. 222) to the Notice of Intention on the grounds that the Silage was property of the Debtor's bankruptcy estate and subject to BSB's blanket lien. BSB also argued that Stoll should have raised the issue either by commencing an adversary proceeding for a

determination of the parties' respective rights to the Silage or, alternatively, by seeking relief from the automatic stay.

In response, Stoll filed the Motion. Thereafter, BSB conducted a Rule 2004 examination of Mr. Hatfield. BSB also issued a subpoena to Mr. Hatfield—with which Mr. Hatfield complied—to testify at the hearing on the Motion. At no time during the hearing did BSB object to going forward on the Motion or the Court adjudicating this dispute in the context of a contested matter rather than an adversary proceeding. During the hearing, Stoll presented Mr. Hatfield's testimony on direct examination, and BSB cross-examined Mr. Hatfield. Over Stoll's objection, the Court also allowed BSB to call its own witness, Brian Bischoff, an employee of BSB (although, as it turns out, Mr. Bischoff's testimony was immaterial and did not affect the Court's analysis of the issues). Stoll Farm Inc.'s Exhibits 1–5 and Bath State Bank's Exhibits A–K, as well as the ASA, were admitted into evidence by stipulation of the parties. Following closing arguments, the Court directed the parties to submit post-hearing briefs on the applicability of the Food Security Act of 1985, 7 U.S.C. § 1631 (2009) ("Food Security Act"). In its Memorandum of Law of Stoll Farms, Inc. Regarding 7 U.S.C. § 1631 (Protection for Purchasers of Farm Products) ("Stoll FSA Memorandum") (Doc. 250), Stoll stated that emergency relief was no longer necessary because "[o]ver the past few days, Stoll has sold its more than 3,000 dairy cows." Stoll FSA Memorandum at 5.

## IV. Arguments of the Parties

### A. Initial Arguments

Stoll relies on § 362(d) of the Bankruptcy Code, which provides, in pertinent part, as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d)(1) & (2). As the party opposing the request for relief from stay, BSB has the burden of proof on all issues other than the issue of the Debtor's equity in the Silage. *See* 11 U.S.C. § 362(g).

The only basis that Stoll asserted for relief from stay in the Motion and during the hearing on the Motion is that the Silage is "owned by Stoll but held by the Debtor." Motion at 1. Stoll argued that Hatfield Dairy "acted in a capacity equivalent to that of a broker, with no intention of taking possession of the corn silage." Motion at 2–3. In its brief in support of the Motion, Stoll stated that "[o]wnership of the corn silage transferred directly from Hendren Farms to Stoll" and that "Hatfield [Dairy], as the broker of the transaction, arranged for the transfer of corn silage from Hendren Farms to Stoll but did not ever take ownership of the corn silage." Memorandum of Law of Stoll Farms, Inc. Regarding Hearing on Motion for Relief from Stay ("Stoll Stay Memorandum") (Doc. 249) at 2. Stoll also contends that Hatfield Dairy was storing the Silage under a bailment arrangement. *See id.* at 3 ("Subsequent to the delivery of the corn silage to the Hatfield facility, Hatfield [Dairy] served as a bailee of the corn silage."). Stoll argues that, because of the broker and bailment arrangements, BSB's lien never attached to the Silage.

In response, BSB contends that the evidence does not demonstrate the existence of a brokerage or bailment arrangement. BSB also argues that the Silage is an asset of the Debtor's bankruptcy estate and that BSB's blanket lien provides it a properly perfected, first and best, lien on the Silage that defeats any interest held by Stoll. BSB posits that, at most, Stoll could argue that the Silage is held in constructive trust for its benefit. Yet, BSB points out that even if the Silage were subject to a constructive trust imposed at the time of the Stoll–Hatfield transaction, it would not elevate Stoll's interest in the Silage above BSB's properly perfected lien in the Silage, which would be first in time, having attached at the time Hatfield Dairy acquired the standing corn from Hendren. In the Objection, BSB also argues that, rather than filing a motion for relief from the automatic stay, Stoll should have commenced an adversary proceeding to determine the validity, priority or extent of BSB's liens on the Silage.

## B. Arguments Regarding the Food Security Act

In the Motion and during the hearing, Stoll never argued that it purchased the Silage from Hatfield Dairy; in fact, Stoll maintained that it purchased the Silage from Hendren and that title did not pass through Hatfield Dairy. In its post-hearing memorandum, however, Stoll stated that "Stoll purchased 3,000 tons of corn silage from Hatfield, for the sum of $195,000, on September 29, 2008." Stoll FSA Memorandum at 1. This was in response to the Court's request for briefing on the applicability and operative effect of the Food Security Act. Stoll contends that "Stoll should still be granted relief of stay

even if Hatfield [Dairy] did take ownership of the corn silage" because the Food Security Act "allows a farmer to buy farm products free and clear of any security interests created by a selling farmer." *Id.* While Stoll agrees that the Silage is a farm product, it contends that it was a buyer who in the ordinary course of business bought the Silage from Hatfield Dairy and that Hatfield Dairy was a seller engaged in farming operations.

BSB contends that the Food Security Act does not apply at all unless a "sale" occurs and that a sale did not occur here. According to BSB: "[U]nless a document of title (such as a bill of sale) has been provided, title to goods cannot and does not transfer until they have both been identified and their delivery has been made. Furthermore, until this has occurred the FSA simply does not apply." The Bath State Bank's Post–Hearing Brief as to Applicability of Farm Security Act with Respect to Stoll Farms, Inc.'s Motion for Relief from Stay ("BSB Memorandum") (Doc. 251) at 2. In addition, BSB contends that Stoll was not a buyer of the Silage in the ordinary course for several reasons: (1) because "the only evidence that is before the Court is that Stoll had periodically (but not regularly or consistently) purchased silage from [Hatfield Dairy][,]" *id.* at 5–6; (2) because "there is no evidence before the Court that this type of transaction would be in the ordinary course of the farming operations of [Hatfield Dairy,]" *id.* at 6; and (3) because Stoll allegedly was a creditor of Hatfield Dairy at the time that Hatfield Dairy turned the corn purchased from Hendren into the Silage. *See id.* According to BSB, therefore, the Food Security Act does not protect Stoll. *See Id.* at 4–5.

## V. Legal Analysis

### A. This Matter is Ripe for Decision.

■ In the Objection, BSB argued that Stoll should have commenced an adversary proceeding. The Court, however, concludes that it is appropriate to rule on the merits of the Motion at this time. BSB received sufficient notice of the Motion and responded to the Motion on its merits. BSB also had an opportunity—of which it availed itself—to conduct a Rule 2004 examination of Mr. Hatfield prior to the hearing. During the hearing, BSB examined witnesses, introduced exhibits and made an opening statement and a closing argument. Moreover, during the hearing, BSB did not object to going forward. BSB, therefore, has waived the procedural defects arising from Stoll's failure to file an adversary proceeding, and it would serve no purpose to require technical compliance with Federal Rule of Bankruptcy Procedure 7001(2) under these circumstances. *See In re Colston,* 213 B.R. 704, 709 (Bankr.S.D.Ohio 1997) ("[T]he requirement to bring an action via an adversary proceeding may be waived by the party that the requirement seeks to protect. In this case, as [the respondent] has responded to the Debtor's motion on its merits, it is the court's conclusion that no purpose would be served by insisting on [an adversary proceeding]." (citations and internal quotation marks omitted)); *In re Rowland,* 140 B.R. 206, 207 n. 1 (Bankr. S.D.Ohio 1992) ("Generally, a relief from stay proceeding is not the proper forum in which to determine whether property is property of the bankruptcy estate or property of another. Instead, Bankr.R. 7001(2) requires the filing of an adversary proceeding 'to determine the validity, priority, or extent of a lien or other interest in property....' However, where parties deliberately argue the merits of their positions, and appear to have waived any technical defects in procedure, no purpose would be served by insisting on the technically correct procedure at this late date."

(citation omitted)); *In re Gee*, 124 B.R. 586, 590 (Bankr.N.D.Okla.1991) ("Determination of validity, priority or extent of interests in property should be carried out by adversary proceeding, Bankruptcy Rule 7001(2), and not by motion for relief from stay or any other motion. However, both [parties] deliberately argued the merits of their positions, and appear to have waived any technical defects in procedure. Both parties received sufficient notice and opportunity to present their positions to satisfy due process. No purpose would be served by insisting on technically correct procedure at this late date.").

## B. Stoll is Not Entitled to Relief from the Automatic Stay.

■ Stoll's primary argument is that the Silage is not an asset of the Debtor's bankruptcy estate because Stoll purchased the Silage from Hendren, and Hatfield Dairy acted only as a broker. The evidence, however, is to the contrary. The evidence showed that Stoll agreed to buy from Hatfield Dairy, and Hatfield Dairy agreed to sell to Stoll, a certain amount of corn silage. This was consistent with past dealings between Stoll and Hatfield Dairy. The only thing that was different with respect to the transaction that gives rise to this dispute is that Hatfield Dairy did not have the silage and could not produce silage from its own corn, so Hatfield Dairy entered into a separate agreement with Hendren to buy standing corn. The evidence showed no agreement between Hendren and Stoll directly or even indirectly through Hatfield Dairy. Rather, the evidence demonstrated the existence of two agreements: (1) Hatfield Dairy and Hendren entered into an agreement for the purchase of standing corn, which Hatfield Dairy was permitted to cut and haul away through others acting on its behalf; and (2) Hatfield Dairy and Stoll entered into an agreement under which Hatfield Dairy agreed to sell, and Stoll agreed to buy, the Silage. Stoll's contention that it purchased the Silage from Hendren is akin to a homebuyer arguing that he bought his custom-built home from The Home Depot because the seller/builder purchased the lumber, siding and other materials from The Home Depot with money the buyer gave the seller/builder in advance. Hendren was not the seller of the Silage any more than The Home Depot would be the seller of the house.

Stoll also argues that it had a brokerage or bailment relationship with Hatfield Dairy. But rather than showing a brokerage or bailment relationship, the evidence showed that Hatfield Dairy and Stoll entered into a contract under which Hatfield Dairy agreed to sell, and Stoll agreed to buy, the Silage. *See Potter Fur & Roots, Inc. v. Potter Group Worldwide, Inc.*, 2006 WL 2336940 at *4 (Ohio App. Aug. 11, 2006) (holding that goods were the subject of a purchase agreement not a brokerage agreement and stating that " 'A broker is an agent employed to effect bargains and contracts . . . between other persons for a compensation called brokerage. He takes no possession, as a broker, of the subject-matter of the negotiations.' ") (quoting *French v. Toledo*, 81 Ohio St. 160, 90 N.E. 160, 161 (1909)). *See also Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 2006 WL 3366167 at *5 (E.D.Pa. Nov.20, 2006) ("A broker negotiates and facilitates contracts between parties in exchange for a fee. A broker does not personally enter into a contract with one party, and then hire another party to fulfill its obligation created by the first agreement." (citation omitted)). Hatfield Dairy entered into a contract with Stoll and a separate contract with Hendren; Hatfield Dairy did not effectuate a contract between Hendren and Stoll.

Stoll notes that "[n]o objection or other notice was filed by any creditor or other party to the listing of the corn silage as property held for Stoll by Debtor." Motion at 2. BSB, however, contests the accuracy of the listing now. Further, the credibility of the listing is questionable because, as Mr. Hatfield testified, the information contained in the schedules was not entirely accurate in that it stated that the Debtor was to produce standing corn, when in fact it was to produce corn silage. Moreover, how a transaction may be characterized in a debtor's bankruptcy schedules does not alter its true nature. In short, the manner in which Hatfield Dairy described its transaction with Stoll in the schedules provides absolutely no basis for a ruling in Stoll's favor.

Stoll initially argued that it purchased the Silage from Hendren—which, as described above, is a position that was wholly unsupported by the evidentiary record made at the hearing on the Motion. BSB responded with an argument that Stoll could not prevail based on a constructive trust theory—which is true. *See Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922, 931 (6th Cir.2000) ("[A] constructive trust is an equitable interest that exempts property from the bankrupt's estate under § 541(d), *only* if the trust is declared by a court in a separate *prepetition* proceeding or a state statute provides that the property is to be held in trust for a particular purpose.").[2] Stoll, though, has not relied on the law of constructive trusts. BSB (like Stoll) initially ignored the Food Secu-

rity Act and therefore asserted that the Court need only decide that Stoll did not purchase the Silage from Hendren. But, as one district court has stated, "the Court has a duty to 'get it right'" despite the parties' arguments and "even where both parties may have been mistaken." *Digital Control Inc. v. Charles Mach. Works,* 2003 WL 25782745 at *5 (W.D.Wash. Dec.11, 2003). The only way to get it right here is to decide what the outcome should be, given that, as the evidence demonstrated, Stoll agreed to buy the Silage from Hatfield Dairy, not from Hendren.

Parties who enter into purchase contracts as buyers in the ordinary course of business have certain rights against holders of prior security interests in the subject matter of the purchase contract. Depending on whether the Silage is inventory or a farm product, the UCC or the Food Security Act controls those rights here. The parties agree that the Silage is a farm product, and the Court sees no reason to rule otherwise. Because the parties agree that the Silage is a farm product and because Ohio's version of the UCC—like the UCC of many states—does not grant to purchasers of farm products the same protection afforded to other buyers in the ordinary course of business, the Food Security Act provides Stoll with its only potential legal ground for recovering the Silage.[3]

The Food Security Act states in pertinent part:

---

2. In *Newpower,* the majority held that the victim of a debtor's prepetition theft is entitled to relief from the automatic stay to obtain a judgment of constructive trust in a state court action initiated prepetition and that the issue of whether such a judgment would have a prepetition effective date would be governed by state law. *See id.* at 937.

3. Courts have turned to the UCC to fill in gaps—such as undefined terms—in the Food Security Act. *See First State Bank of Athens v. Purina AG Capitol Corp.,* 113 S.W.3d 1, 7 (Tex.App.1999) (applying the UCC to determine the meaning of a term used in, but not defined by, the Food Security Act). Thus, the Court may look to the Ohio UCC for interpretative guidance here.

Except as provided in subsection (e) of this section and notwithstanding any other provision of Federal, State, or local law, a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, even though the security interest is perfected; and the buyer knows of the existence of such interest.

7 U.S.C. § 1631(d). The exceptions provided in subsection (e) do not apply here.

 In § 1631(d), the Food Security Act refers to a "buyer" who "buys" a farm product. The Food Security Act does not define the terms "buyer" or "buys." The Ohio UCC, though, defines "buyer" to mean "a person who buys or contracts to buy goods." Ohio Rev.Code Ann. § 1302.01(A)(1) (West 2010). This definition draws a distinction between the act of buying and the act of contracting to buy. This is important because the Food Security Act defines the term "buyer in the ordinary course of business" to mean "a person who, in the ordinary course of business, buys farm products from a person engaged in farming operations who is in the business of selling farm products." 7 U.S.C. § 1631(c)(1). Like § 1631(d), § 1631(c)(1) uses the term "buys" and does not add to it (as does the Ohio UCC when defining the term "buyer") the phrase "or contracts to buy." The word "buys" standing alone implies the existence of a completed sale, not merely a contract to sell. Thus, as the court held in the only decision either party cited on the issue, the Food Security Act protects the purported buyer only if a sale has occurred. *See Purina AG Capitol,* 113 S.W.3d at 5 ("Only if there was a sale would the protections set forth in the [Food Security Act] be applicable.").

 This raises the question of what constitutes a sale. Because the Food Security Act does not define the term "sale," the Court will again look to the Ohio UCC. *See Purina AG Capitol,* 113 S.W.3d at 7 (applying Texas law to determine the meaning of "sale" under the Food Security Act). Under Ohio law "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." Ohio Rev.Code Ann. § 1302.01(A)(11). Construing a Michigan statutory provision under which the definition of a sale was the same as in Ohio, the Sixth Circuit has held that a sale occurs only when title passes. *See GMAC Bus. Credit, L.L.C. v. Ford Motor Co.,* 100 Fed. Appx. 404, 406 (6th Cir. June 3, 2004) (unpublished) ("The two courts below concluded, as a matter of law, that since the goods were not delivered to a carrier at the Supplier's (i.e.Debtor's) plant, title did not pass (and, consequently, no sale) occurred. We agree."). The provisions of the Ohio UCC "with regard to the rights, obligations, and remedies of the seller, the buyer, purchasers, or other third parties applies irrespective of title to the goods *except where the provision refers to that title.*" Ohio Rev.Code Ann. § 1302.42 (emphasis added). The provision defining "sale" refers to title and states that a sale consists in the passing of title from the seller to the buyer for a price, so the Court concludes that title must pass for a sale to have occurred. Although in some states the UCC provision that "concerns the identification of goods to the contract, also has been used to determine whether a sale has taken place[,]" Frederick H. Miller & Neil B. Cohen, 9B *Hawkland and UCC Series* § 9–320:2[Rev] (2009). The Court has been unable to find any controlling case law from Ohio on the issue and therefore will follow the Sixth Circuit's holding in *GMAC Business* that, if title did not pass, no sale occurred.

■ The Court thus must determine whether title to the Silage passed to Stoll. The Food Security Act does not address the issue of passage of title, so the Court again will look to the Ohio UCC. The UCC provides that "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." Ohio Rev.Code Ann. § 1302.42(A). No evidence was presented at the hearing demonstrating the existence of any "conditions explicitly agreed on by the parties" regarding the passage of title. The Court finds that a condition is "explicitly agreed on" only if there is an express contract, which is one of the three types of contracts recognized in Ohio. *See B & J Jacobs Co. v. Ohio Air, Inc.,* 2003 WL 22103385 at *2 (Ohio Ct. App. Sept.12, 2003) ("Ohio recognizes three types of contracts: express, implied in fact, and implied in law. As opposed to express contracts, implied contracts are those that are not created or evidenced by the explicit agreement of the parties, but inferred by the law as a matter of reason and justice.... 'In an implied [in fact] contract no ... formal offer and acceptance occurs and no express agreement exists. In contrast, the meeting of the minds must be established by demonstrating that the circumstances surrounding the parties' transaction make it reasonably certain the contract exists 'as a matter of tacit understanding.' " (citation and internal quotation marks omitted)). *See also ATS Ohio, Inc. v. Tracy,* 76 Ohio St.3d 297, 667 N.E.2d 937, 941 (1996) ("[I]f there is a written contract between ATS and its customer explicitly providing for transfer of title upon receipt of a progress payment, the parties have 'explicitly agreed' and title passes in accord with [Ohio Revised Code § ] 1302.42(A)."). Although Mr. Hatfield testified that he did not intend to take title to the Silage on behalf of Hatfield Dairy, there was no evidence of an agreement at all (*i.e.,* meeting of the minds) between Stoll and Hatfield Dairy regarding the passage of title, and certainly no evidence of an explicit agreement (as opposed to an implied agreement) between Stoll and Hatfield Dairy regarding the passage of title.

Given the lack of an explicit agreement regarding the passage of title, the relevant provision of the Ohio UCC that applies in this case provides as follows:

(B) Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading:

(1) If the contract requires or authorized the seller to send the goods to the buyer but does not require the seller to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(2) If the contract requires delivery at destination, title passes on tender there.

Ohio Rev.Code Ann. § 1302.42(B).

Because it was not otherwise explicitly agreed, title to the Silage would pass to Stoll "at the time and place at which the seller [Hatfield Dairy] completes performance with reference to the physical delivery of the goods" and, "[i]f the contract requires delivery at destination" (which the agreement between Hatfield Dairy and Stoll did) then "title passes on tender there" (that is, at the Stoll farm).

It is enlightening to contrast the facts present here with those in another recent bankruptcy case. *See United Bank of Iowa v. Indep. Inputs (In re W. Iowa*

*Limestone, Inc.),* 538 F.3d 858 (8th Cir. 2008). The outcome in *Iowa Limestone* was governed by the UCC, not the Food Security Act, but the decision is still relevant to the buyer-in-the-ordinary course issue:

> This case involves a dispute between a secured lender (who held a security interest in its debtor's inventory) and subsequent purchasers of that inventory (who left their purchased goods on the debtor's premises) over whose interest took priority when the debtor filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. . . .

> . . . The Dealers [the buyers] paid for the ag lime at the time of the purchases, and each of the bills of sale noted that the ag lime would remain at the quarry until the Dealers sold the ag lime to their ultimate customers. This arrangement was beneficial to [the debtor] WIL, which also provided trucking services. WIL maintained its ag lime in a single fungible pile on its premises. The ag lime that the Dealers purchased likewise remained in the fungible pile until resold to their customers and removed from the premises.

> . . . .

> . . . The parties specifically contemplated that title would pass at the time of the bill of sale and that delivery would take place at WIL's quarry, where the ag lime would remain. . . . The Dealers each filed affidavits stating that they inspected the ag lime and accepted it at WIL's place of business. It is undisputed that the Dealers paid for the ag lime at the time of acceptance. The bankruptcy court below found that title to the ag lime passed to the Dealers at the time of the sale, and United Bank does not contend otherwise. . . .

> . . . We hold that the Dealers constructively possessed the ag lime left at WIL's quarry based on the completed sale, the identification of the ag lime to the contract, and the agreement in the bill of sale between the Dealers and WIL that the ag lime would remain on WIL's premises until resold.

*Iowa Limestone, Inc.,* 538 F.3d at 861, 867 (citations omitted).

Although they could have done so, Hatfield Dairy and Stoll did not do what the parties in *Iowa Limestone* did—expressly agree that title would pass at the time of the bill of sale and that delivery would take place at the debtor's place of business, as well as arrange for the inspection and acceptance of the goods at the debtor's place of business—so that the buyers were protected against the lender's lien even though the goods were left on the debtor's premises. Just to be clear, it bears noting that the Hatfield Dairy invoice is not a bill of sale. *See Prod. Steel, Inc. v. Sumitomo Corp. of Am. (In re Prod. Steel, Inc.),* 54 B.R. 417, 420 (Bankr.M.D.Tenn.1985) ("An invoice is merely a 'detailed statement of the nature, quantity and cost or price of the things invoiced.' It 'is not a bill of sale, nor is it evidence of a sale.' *Dows v. Nat'l Exch. Bank of Milwaukee,* 91 U.S. 618, 630, 23 L.Ed. 214 (1875). In *Dows,* the Supreme Court rejected the contention that delivery of an invoice, without more, was sufficient to pass a property interest. The Court stated that transmission of the invoices 'is of no significance by itself.'" (quoting *Dows,* 91 U.S. at 630)).

The Court accordingly concludes that a sale of the Silage had not yet taken place as of the Petition Date. Given its ruling that Stoll was not yet a buyer of the Silage as of the Petition Date, the Court need not decide whether the 2008 transaction between Stoll and Hatfield Dairy was in the ordinary course of business.

## VI. Conclusion

For the foregoing reasons, the Motion is **DENIED.**

**IT IS SO ORDERED.**